No. 40,564

The Fourth National Bank in Wichita, *Appellee*, v. Fred Hill and Nellie B. Hill, His Wife; Sammie C. Hill; Producers Loan Company; Farmers and Mechanics Trust Company; Security National Bank of Kansas City; Nelson H. Poe; Allen H. Poe and United States of America, *Appellants*.

(314 P. 2d 312)

Opinion filed July 31, 1957.

*George Stallwitz* and *Richard W. Stavely,* of Wichita, argued the cause, and *W. F. Lilleston, George C. Spradling, Henry V. Gott, Ralph M. Hope,* and *Charles S. Lindberg,* of Wichita, and *R. C. Woodward* and *H. P. Woodward,* of El Dorado, were with them on the briefs for appellants.

*Dwight S. Wallace,* of Wichita, argued the cause, and *Jimmie E. Grey, Donald C. Tinker, Jr.,* of Wichita, and *L. J. Bond* and *Robert Bond,* of El Dorado, were with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: This was an action to foreclose a real estate and chattel mortgage. Trial was by the court, and judgment was rendered for the plaintiff. Defendants Sammie C. Hill and Nelson H. Poe have appealed.

The action was commenced April 6, 1955, by The Fourth National Bank in Wichita, as plaintiff, hereafter referred to as Fourth, against the principal defendants Fred Hill and Nellie B. Hill, his wife; their son, Sammie C. Hill; Nelson H. Poe; and, Security National Bank of Kansas City, hereafter respectively referred to as the Hills, Sammie Hill, Poe and Security.

Following trial, the court made extensive findings of fact and conclusions of law, which are summarized as follows: On December 10, 1952, the Hills, for value received, executed to Fourth their promissory note for $186,000 to become due December 10, 1953. To secure that note they executed two mortgages in favor of Fourth dated the same day as the promissory note, which were filed of record in Butler, Harvey and Sedgwick Counties December 11, 1952, and upon which the mortgage registration fee was paid. One was a real estate mortgage covering property located in the cities of Potwin, Whitewater and McLain in Butler and Harvey Counties, and the other was a chattel mortgage given as additional security and covering seven elevators located on railroad rights of way at El Dorado, Chelsea, Cassoday, Brainerd, McLain and Furley, Kansas, in Sedgwick, Harvey and Butler Counties, which were operated under various firm names and styles, and which included,

". . . 'All fixtures and equipment pertaining to the elevators above described . . .,' and all the fixtures and equipment pertaining to two elevators in Potwin which were covered by the realty mortgage . . . The chattel

mortgage also covered 'All right, title and interest of Party of the First Part in, to and under the leases and leasehold estates on which the aforesaid elevators on railroad rights of way are located.' "

In addition to the described elevators, their fixtures and equipment, other buildings and equipment were situated on the premises referred to in the chattel mortgage, most of which was physically attached to the elevators while others, such as office buildings, a coal shed, two warehouse buildings and one barn, were not so attached but were separate and apart from the elevators. The chattel mortgage also covered fixtures and equipment contained in a store building in Potwin and a store building and general office building in Whitewater, which buildings were covered by the real estate mortgage.

Both mortgages were made subject to two leases "with option to purchase" the properties covered by the mortgages for $186,000, which leases had been previously entered into between the Hills and Poe on January 14, 1952, and March 1, 1952, for a term of five years at an annual cash rental of $44,000. All of the Hills' rights and interest in those leases, including the rentals, were assigned by them to Fourth on March 12, 1952, for application upon their indebtedness. The real estate mortgage expressly included all extensions, renewals and changes in the form of the note to Fourth, but the chattel mortgage contained no such provision. Neither mortgage contained an after-acquired property clause. The chattel mortgage contained no warranty, but the real estate mortgage contained the usual warranty except the mortgagors bound only themselves and not their heirs and assigns.

On February 16, 1953, Sammie Hill entered military service and on March 16, 1953, the Hills for a valuable consideration, by quitclaim deed and by bill of sale, sold the properties involved in this lawsuit to Sammie Hill. The sale was made subject to Fourth's mortgages, which Sammie Hill neither assumed nor agreed to pay.

On January 12, 1954, the Hills, having failed to pay their note to Fourth when it became due December 10, 1953, executed a renewal note to Fourth in the sum of $146,702.51, the amount then due and unpaid. Payments on the renewal note were scheduled as follows: $1,000 on or before February 12, 1954, and a like amount on the 12th day of each succeeding month for ten additional months with the final payment including accrued interest due on January 12, 1955. Fourth retained the original note as security for the renewal

note, which likewise was secured by the chattel and real estate mortgages heretofore referred to.

In order to give the Hills an opportunity to work out of their financial difficulties, Sammie Hill leased to Poe on January 1, 1954, the elevator properties described in both mortgages for a period of one year at a monthly rental of $1,000. As a part of the consideration of the new lease, the two leases previously executed by the Hills to Poe in 1952 with "option to purchase" were "cancelled, terminated, released and set aside" subject to the consent and approval of Poe and Fourth. On January 16, 1954, Sammie Hill assigned his rights and interest in the new lease to Fourth, which was accepted by Poe January 22, 1954, and on January 25, 1954, Fourth accepted the assignment and consented to the cancellation of the two prior leases with "option to purchase." At the time of the assignment of the new lease Sammie Hill was not indebted to Fourth, nor was he ever indebted to it. Pursuant to that lease and assignment Poe made twelve payments of $1,000 each to Fourth between January 22, 1954, and January 4, 1955, which, by agreement between the Hills, Sammie Hill, Poe and Fourth, were credited against the indebtedness of the Hills to Fourth.

On April 10, 1954, Sammie Hill gave to Poe his power of attorney to handle his various personal affairs in connection with the feeding of cattle and the operation of the properties involved, including the borrowing of money. On May 1, 1954, Poe procured on Sammie Hill's behalf a line of credit with Security resulting in substantial loans to Sammie Hill, which were secured by mortgages on cattle and other collateral. In addition to obtaining loans from Security, Poe furnished money of his own for Sammie Hill's cattle feeding operations from May 1, 1954, to November 7, 1955, the date of the trial, totaling $107,000.

Fourth failed to file renewal affidavits on the chattel mortgage when due on December 11, 1954. On December 13, 1954, Sammie Hill, through Poe, his attorney in fact, executed a mortgage in favor of Security covering all of the properties described in Fourth's chattel mortgage and in describing those properties, used the same identical description of the properties contained in the Hills' chattel mortgage to Fourth. Prior to recording the Sammie Hill mortgage on December 21, 1954, both as a real estate and a chattel mortgage, and paying the mortgage registration fee, Poe procured searches of the records in the three counties in which Fourth's

chattel mortgage was recorded, which revealed that no renewal affidavits had been filed by Fourth on its chattel mortgage from the Hills recorded December 11, 1952. Poe furnished his attorney, Mr. George Stallwitz, the information to prepare the mortgage to Security and he (Poe) had knowledge as late as January 4, 1955, that the Hills' indebtedness to Fourth had not been paid inasmuch as he paid $1,000 on that indebtedness pursuant to the assignment to Fourth of the 1954 lease between Sammie Hill and himself.

The first actual knowledge Security had of the mortgage executed by Sammie Hill, through his attorney in fact, was when Poe presented it on December 24, or 27, 1954, although Security had previously received a letter from Mr. Stallwitz dated December 21, 1954, notifying it of the existence of the Sammie Hill mortgage and of the existing indebtedness of the Hills to Fourth. Security did not request the mortgage from Sammie Hill or from anyone acting in his behalf, nor was any money advanced for Sammie Hill's cattle feeding operation by virtue of that mortgage. When Poe delivered the mortgage to Security he discussed with its president the prior existing mortgage to Fourth and told that official that Fourth had "slipped up" on filing its renewal affidavits. Security notified Poe that it did not know whether it would accept the mortgage; that it would not do anything unethical, and that its officers would have to discuss the acceptance of the Sammie Hill mortgage, however, it retained possession of the mortgage pending their decision. When Poe delivered the mortgage to Security, he stated he wanted to protect Security and that he also wanted to protect himself by having the mortgage reassigned to him personally to secure him for money he furnished to feed Sammie Hill's cattle then mortgaged to Security. Security told Poe that when Sammie Hill's debt was paid, it could see no reason why the mortgage should not be assigned to him.

On January 25, 1955, approximately 45 days after December 11, 1954, when Fourth should have filed its renewal affidavits, it caused renewal affidavits of the chattel mortgage executed by the Hills to it, to be filed of record. On February 24, 1955, a month after Fourth filed its renewal affidavits, Security verbally and by letter notified Fourth that it still did not know whether it would accept the Sammie Hill mortgage. However, in April, 1955, following a conference with its attorneys, Security accepted that mortgage and placed it in its collateral file. In the course of conducting its

business, Security maintained a liability ledger sheet for its customers showing indebtedness, endorsers and security, and that sheet did not show that the Sammie Hill mortgage dated December 13, 1954, was ever listed as security for any loans to him. Security did not at any time look to that mortgage as security since it was always adequately secured by other collateral.

On January 1, 1955, Sammie Hill executed a new lease to Poe covering the elevators described in the chattel mortgage to Fourth for a term of two years with an aggregate rental of $24,000 payable at $1,000 per month. This lease contained a similar provision as that in the leases from the Hills to Poe and Sammie Hill to Poe, i. e., that Poe should not make any alterations in or additions to the improvements on the real estate without the written consent of Sammie Hill "and any improvements made should be and become a part of the premises and the property of Lessor, and Lessee shall not . . . acquire any title . . . in or to the improvements so made, or the property to which the same are attached." This lease contained no provision for assignment of rents to Fourth for application upon the Hills' indebtedness.

On April 6, 1955, Fourth commenced this action and on May 17, 1955, Mr. Stallwitz filed an application on behalf of Sammie Hill to stay the action under the Soldiers' and Sailors' Civil Relief Act (50, App. U. S. C. A. 501, et seq.). On June 14, 1955, the trial court entered a personal judgment in favor of Fourth and against the Hills for $134,702.51, and on that date overruled Mr. Stallwitz' application to stay the action on behalf of Sammie Hill and appointed him attorney for Sammie Hill pursuant to the Soldiers' and Sailors' Civil Relief Act.

On October 31, 1955, Mr. Stallwitz filed a second application for stay under the Soldiers' and Sailors' Civil Relief Act and a motion for continuance, which were overruled by the trial court, and the case was set for trial November 7, 1955. Attached to and as a part of the motion for continuance was the affidavit of Mr. Stallwitz, which stated that Sammie Hill was in the Armed Forces of the United States serving overseas on the Island of Guam, and that if he were present he would give true testimony,

"That he is the owner of all of the properties, both real and personal, as described in the pleadings . . . and that *he acquired the same* from Fred Hill and Nellie B. Hill, his wife, *on or about March 16, 1953* . . ." (Emphasis supplied.)

When the trial commenced November 7, 1955, Mr. Stallwitz renewed his application for stay for the third time, and it was denied the third time. Fourth introduced its evidence and rested, and the trial court overruled Sammie Hill's and Security's demurrers to that evidence. Those defendants introduced their evidence, and at the conclusion of the trial the trial court made extensive findings of fact, heretofore summarized, and conclusions of law, the pertinent portions of which are quoted:

"2. The chattel mortgage of December 10, 1952, and the real estate mortgage of December 10, 1952, between Fred Hill and Nellie B. Hill as mortgagors and Fourth as mortgagee, security for the above described notes, are subject to foreclosure because of the default of the maker of the aforesaid notes to pay the same according to their terms.

"3. The real estate mortgage of December 10, 1952, between Fred Hill and Nellie B. Hill and the Fourth is a first lien on the property therein described.

"4. Security took its chattel mortgage to the personalty described in the chattel mortgage of December 10, 1952, between Fred Hill and Nellie B. Hill and Fourth, with knowledge of the mortgage of the Fourth, and by virtue thereof, are not mortgagees in good faith as referred to in Sec. 58-303, G. S. 1949.

"5. Fourth filed its renewal affidavit to the chattel mortgage of December 10, 1952, on January 25, 1955, in Sedgwick Counay and Harvey and Butler Counties, respectively, and before any other mortgage or lien was obtained thereon in good faith, or purchase made in good faith, and under the provisions of Section 58-304, G. S. 1949, said mortgage continued with the same force and effect as if the affidavit had been filed within the term as set forth in Section 58-303, G. S. 1949.

"6. The chattel mortgage of December 10, 1952, between Fred Hill and Nellie B. Hill and the Fourth is a first lien on the property therein described.

"7. The chattel mortgage of Security is secondary to the chattel mortgage of Fourth on the property therein described.

"9. Sammie C. Hill acquired for a valuable consideration the right, title and interest of Fred Hill and Nellie B. Hill to the real property and personalty in question, subject to the liens of Fourth, and prior to the time that the United States Govenment filed its liens against Fred Hill and Nellie B. Hill, and the United States Government has no interest in the real or personal property in question.

"10. Nelson Poe's interest in the property in question is limited to his tenancy under lease with Sammie Hill, which is subject to the first and prior lien of the Fourth.

"11. Nelson H. Poe acquired no interest in the chattel mortgage dated December 13, 1954, between Sammie Hill and Security, and any agreement between Nelson Poe and Security, whereby Security agreed to assign the same mortgage to Nelson Poe, after Security had been paid in full by Sammie Hill, is void and of no effect.

"13. Defendant Nelson H. Poe is entitled to file an amended answer setting up his right to an assignment of the chattel mortgage now held by the Security National Bank."

On September 11, 1956, in accordance with its conclusions of law, the trial court ordered that the property covered by the real estate mortgage be sold at public auction subject to the right of redemption within eighteen months from the day of sale; that Fourth be given immediate possession of the property described in the chattel mortgage, and that it be sold at public or private sale without equity of redemption according to the terms of the mortgage and the provisions of law relating to the foreclosure of chattel mortgages, free and clear of all liens and claims of Sammie Hill, Poe and Security. The trial court stayed its judgment for fifteen days to permit Poe to remove certain personal property he had placed in the elevator buildings which was not covered by Fourth's chattel mortgage.

On September 11, 1956, Sammie Hill, Poe and Security filed their motion for a new trial, which was overruled by the court on September 26, 1956, and on that date it was stipulated by the parties that the indebtedness secured by the mortgage given by Sammie Hill to Security on December 13, 1954, had been paid in full.

Following judgment a disagreement arose between Poe and Fourth as to what fixtures and equipment belonged with the elevators at the time the chattel mortgage was executed; what fixtures and equipment had been added by Poe, and whether they became a permanent part of the elevators. Poe claimed ownership to certain molasses equipment he purchased in September, 1954, June, 1955, and July, 1955, consisting of tanks and feed mixers which he installed on the McLain and Potwin elevator premises and in the feed-mill building at El Dorado; also, a fire alarm system he purchased and installed in the properties in September, 1952, consisting of special filament wire and a siren attached to the outside of the elevators. To resolve this controversy, Fourth filed its motion praying that Poe be placed on strict proof of property owned by him and that he be restrained from removing any personal property from the mortgaged premises except upon order of the court. Hearings were had on that motion September 26, 1956, and October 11, 1956. To show the intention of the parties as to what items of property were covered by the chattel mortgage at the time it was executed, Fourth offered in evidence certain inspection reports prepared December 3, 1952, and subsequent dates, by Mills Mutual,

an elevator insurance company, at the request of Poe, showing fire hazards, general condition of the buildings and containing an itemized list of personalty, fixtures, furniture and miscellaneous equipment in each building covered by the chattel mortgage and upon which insurance policies were issued to Fourth as the insured mortgagee. Fourth also introduced an itemized list of personalty, fixtures, furniture and equipment in each building furnished by Poe to Fourth following judgment, which corresponded with the list of Mills Mutual except for a few minor items. Poe introduced his evidence with respect to his ownership of the molasses equipment and the fire alarm system and the manner in which they were installed. At the conclusion of that hearing and on October 26, 1956, the trial court determined the personalty, fixtures, and equipment listed in the inspection reports prepared by Mills Mutual and attached to the insurance policies to be the property of the various elevators at the time of the sale, and made the following findings:

"That the descriptions in plaintiff's chattel mortgage are sufficient to cover all buildings, fixtures and equipment located on the described properties;

"That the molasses equipment and fire alarm system claimed by the defendant Nelson H. Poe are fixtures added to the property, and are covered by and subject to plaintiff's mortgage;

"That the chairs, desks, typewriters, filing cabinets, bag conveyors, scales, moisture testers, and other movable equipment claimed by the defendant Sammie C. Hill is included in the description 'equipment' and is covered by and subject to the plaintiff's mortgage.

"That the defendants Nelson H. Poe and Sammie Hill are entitled to remove any desks, chairs, filing cabinets or equipment of this kind which they own and have placed on the described property subsequent to the plaintiff's mortgage; and if they have removed any such property covered by the plaintiff's mortgage, it should be returned or replaced."

On October 29, 1956, a hearing was had upon Sammie Hill's motion to vacate the judgment entered September 11, 1956, predicated upon 50 App. U. S. C. A. § 532 of the Soldiers' and Sailors' Civil Relief Act. Sammie Hill conceded he entered military service February 16, 1953, and acquired the properties on or about March 16, 1953. In an effort to establish that the equitable title passed to him prior to his entering military service, Poe testified to a conversation between Sammie Hill and Fred Hill on January 20, 1953, at Amarillo, Texas, when Fred Hill said to Sammie Hill, "that he wanted to sell to him what he termed the Kansas properties, elevators, buildings," and that Sammie Hill stated to Fred Hill, "he would purchase the properties." Fourth objected to Poe's testimony on

the grounds that it was contrary to the pleadings and that neither Sammie Hill's nor Poe's answer raised the issue of equitable ownership. The trial court overruled the motion to vacate, and Sammie Hill and Poe have appealed.

As preliminary to a discussion of Sammie Hill's and Poe's contentions we point out that nowhere in their brief do they attack the findings of fact of the trial court as not being supported by substantial competent evidence; further, certain of their specifications of error have not been considered by them in their brief. Under such circumstances, the universal rule of this court is that such questions must be regarded as abandoned and on appeal will not be reviewed or considered. (*Brent v. McDonald,* 180 Kan. 142, 152, 300 P. 2d 396, and cases therein cited.)

## I.

Sammie Hill contends there was a lapse of the security of Fourth's mortgages. He argues those mortgages were made subject to Poe's leases with "option to purchase," which leases were contracts for the purchase of real estate vesting title in Poe, thus making the Hills equitable mortgagees; that Fourth's mortgage liens were on the equitable mortgage interests of the Hills; that when Sammie Hill acquired Poe's title with the consent and approval of Fourth, he took free and clear of Fourth's mortgage liens. The contention is erroneous both in fact and in law.

A lease with an option to purchase real estate creates no estate in the lessee beyond his leasehold interest since an option is simply a contract by which the owner of property agrees with another person that he shall have a right to buy the property at a fixed price within a certain time. (*Bras v. Sheffield,* 49 Kan. 702, 31 Pac. 306; *Caldwell v. Frazier,* 65 Kan. 24, 68 Pac. 1076; *McGregor v. Ireland,* 86 Kan. 426, 428, 121 Pac. 358; *Davis v. Roseberry,* 95 Kan. 411, 414, 148 Pac. 629.) Poe was never obligated to purchase the Hills' interest and there was no completed contract of sale upon which the Hills or Sammie Hill, after he acquired the property, could have sought and obtained specific performance against Poe. Furthermore, all payments made by Poe under the assignment of the 1952 leases to Fourth were paid as rent, not as purchase money. While the Hills had offered and agreed that Poe might have the privilege or option of purchasing the property for $186,000—the amount of their note to Fourth—during the five-year period, Poe did not exer-

cise that option but in fact canceled and surrendered it, but, not without consideration to himself. He was relieved of the payment of $32,000 annual rental to Fourth pursuant to the assignment of the 1952 leases. When Fourth consented to the cancellation and termination of those leases and accepted the assignment of rentals of the January 1, 1954, lease, it forewent payment of $44,000 annual rental from the properties and accepted in lieu thereof a $12,000 annual rental.

The "option to purchase" did not create a title in Poe which could merge into Sammie Hill's title, clearing it of Fourth's liens. Poe had no interest in the properties other than his rights as a lessee. Fourth's mortgages were subject to two leases with option to purchase. When Sammie Hill acquired his title it was subject to those leases and to the mortgage liens. The option to purchase was never exercised and those leases and that option were ultimately canceled and terminated. No title adverse to Fourth was acquired. When Fourth consented to that termination its mortgages became first and prior liens. That its security did not lapse but gained stature by those transactions is evident. The trial court did not err in holding there was no lapse of Fourth's security.

## II.

Sammie Hill contends that when he acquired the properties in March, 1953, by quitclaim deed and bill of sale subject to the mortgage liens of Fourth, he, as a nonassuming grantee, became a surety for the Hills' indebtedness to Fourth and that when Fourth accepted the Hills' renewal note in the sum of $146,702.51 on January 12, 1954, and extended the time of payment to January 12, 1955, he was discharged as a nonassuming grantee of the mortgagors.

There are three defects in that contention. First, if it is assumed that Sammie Hill was a surety, it is clear he participated in the arrangements between the Hills, Poe and Fourth extending the time of payment, and he at least impliedly agreed to the extension. An extension of time of payment of a principal's indebtedness does not discharge the surety if made with his consent. (*Rose v. Williams,* 5 Kan. 483; *Hubbard v. Ogden,* 22 Kan. 363; *Roberson v. Blevins,* 57 Kan. 50, 45 Pac. 63; *Diehl v. Davis,* 75 Kan. 38, 88 Pac. 532.) Sammie Hill not only impliedly consented to the renewal note, but was a principal participant in that transaction when he executed the new lease to Poe on January 1, 1954, canceling the old leases

with option to purchase and made assignment of rents to Fourth to discharge the scheduled payments of the renewal note.

Second, Sammie Hill was not a surety. He acquired title to the property *subject to Fourth's mortgages,* and expressly did not assume nor agree to pay those mortgages, thus he never became liable in any capacity on the mortgage debt. (*Crane v. Hughes,* 5 Kan. App. 100, 48 Pac. 865; *Bowman v. Clyde,* 101 Kan. 165, 165 Pac. 820.) Ordinarily a grantee of mortgaged property does not incur a personal liability for the payment of the mortgage debt, enforceable by the mortgagee, merely because he takes title subject to the mortgage and he is not personally liable to the mortgagee on the mortgage, in the absence of circumstances showing an agreement to discharge the debt. (59 C. J. S. Mortgages, § 399, p. 563.) Furthermore, where land is sold subject to a mortgage, the mortgagee's lien on the land continues, and as between the mortgagor, the mortgagee, and the purchaser, the land is the primary fund for the satisfaction of the encumbrance. (59 C. J. S. Mortgages, § 398, p. 562.) By accepting the quitclaim deed and bill of sale Sammie Hill did not undertake nor become bound to pay the mortgage debt. The trial court found that he acquired title subject to the mortgage liens of Fourth, and that he was never indebted to Fourth. That finding relieved him of all personal liability of the mortgage indebtedness, and, not being bound, he was not a surety for its payment.

Third, the Hills' renewal note of January 12, 1954, expressly provided, among other things, that the original note secured by the real and chattel mortgage liens be retained by Fourth as collateral security for the payment of the renewal note. This court has consistently held that where a note is given merely in renewal of another and not in payment thereof, the renewal does not extinguish the original debt nor in any way change the debt except by postponing time of payment, and, as a general rule, the holder is entitled to the same rights and remedies as if he were proceeding on the original note. (*Howard v. National Bank,* 44 Kan. 549, 24 Pac. 983; *Bank v. Livermore,* 90 Kan. 395, 133 Pac. 734; *Bank v. George,* 105 Kan. 129, 181 Pac. 574; *Security State Bank v. Mossman,* 131 Kan. 508, 292 Pac. 935.) After the renewal note was executed for $146,702.51, that debt, less Poe's payment of $12,000, remained a valid obligation and the mortgage liens continued as security therefor. (*Howard v. National Bank,* supra; *Cornwell v. Moss,*

95 Kan. 229, 147 Pac. 824; *Bank v. Livermore,* supra.) Moreover, where a mortgage is given to secure the payment of a particular debt, the mortgage is not exhausted until the debt is paid or canceled, although the debt may in the meantime be evidenced by several different promissory notes. (*Cooper v. Condon,* 15 Kan. 572, *Capital Co. v. Merriam,* 60 Kan. 397, 56 Pac. 757.)

The renewal note did not discharge nor extinguish the debt secured by the mortgage liens, and the trial court did not err in its holding.

III.

Sammie Hill asserts the Soldiers' and Sailors' Civil Relief Act (50 App. U. S. C. A. § 532) forbade entry of the judgment of foreclosure, and, consequently the trial court erred in refusing to vacate the judgment. That section reads in part:

"(1) The provisions of this section shall apply only to obligations secured by mortgage . . . upon real or personal property owned by a person in military service at the commencement of the period of military service . . ."

. . . . . . . . . . . . . . .

"(3) No sale, foreclosure, or seizure of property . . . of any sum due under any [mortgage], or for any other breach of the terms thereof . . . shall be valid if made after [Oct. 6, 1942] and during the period of military service or within three months thereafter, . . ."

The ownership contemplated by subsection (1) includes equitable as well as legal ownership. (*Hoffman v. Charlestown Five Cts. Sav. Bank,* 231 Mass. 324, 121 N. E. 15; *Twitchell v. Home Owners' Loan Corp.,* 59 Ariz. 22, 122 P. 2d 210; *Guleserian v. Pilgrim Trust Co.,* 331 Mass. 431, 120 N. E. 2d 193.)

Was Sammie Hill the equitable owner of the properties prior to his entry into military service? The evidence relied upon to establish this fact has been heretofore set forth. The trial court concluded that evidence did not establish such ownership and overruled the motion to vacate. We conclude the trial court did not err in that ruling. The testimony was insufficient in law to rise to the dignity of the acquisition of an equitable title. Under the facts and circumstances presented by the record, neither Fred Hill nor Sammie Hill was bound; no price was stated; no terms were agreed upon, and no contract was consummated for the sale of the Kansas properties vesting equitable title in Sammie Hill on January 20, 1953. Thus, he was not entitled to the benefits of Soldiers' and Saliors' Civil Relief Act.

## IV.

Sammie Hill urges that the judgment below was void in part because of insufficiency of description of the property covered by the chattel mortgage. He argues the mortgage lien extended only to elevators and equipment, and that buildings and equipment not attached thereto were not covered. Reduced to its simplest terms, the contention is that the description may be summed up in one word—"elevators." Such a contention ignores a cardinal rule of construction that no one word controls the meaning of an instrument; rather, an instrument is to be read as a whole to ascertain its meaning. Furthermore, that question was not raised by Sammie Hill in his answer and the issue was not before the trial court when the case was tried but was injected into the lawsuit when Fourth's motion was heard requesting that Poe be placed upon strict proof of ownership of property which he might remove from the mortgaged premises.

We are not impressed with the contention. Previous to its assertion, the Hills, Sammie Hill, Poe and Security relied upon the sufficiency of that description. The Hills used that identical description to describe the properties transferred to Sammie Hill by the bill of sale and in the assignment of the leases to Fourth with option to purchase. At the trial and upon appeal, Sammie Hill and Poe strenuously urge that Sammie Hill's mortgage to Security (which contained the identical description of the property in Fourth's mortgage) created a valid and subsisting lien prior to Fourth's. Furthermore, Sammie Hill and Poe used the same identical description to describe the properties covered by the leases of January 1, 1954, and January 1, 1955. Obviously, these appellants attempt to use that description both as a sword and as a shield. In one phase of the lawsuit they insist the property is insufficiently described, and in another phase, strenuously urge its validity.

When the record is considered in its entirety, it is clear the Hills intended to and did mortgage to Fourth the assets of going concerns, *i. e.,* the Potwin Grain Company, the Hill Grain Company, and other grain companies operated under various firm names, and pledged as security for their debt, all properties essential to and an integral part of their operations irrespective of whether all buildings and equipment were physically attached to the elevators. Both parties introduced evidence on that point, which was conflicting. The trial court resolved the conflict in favor of Fourth, and found

the description was sufficient to cover all buildings, fixtures and equipment located on the described properties. That finding was supported by substantial competent evidence and will not be set aside on appeal.

## V.

It is next contended that a jurisdictional fact, a *sine qua non* of the decree, was not established since Fourth failed to prove payment of mortgage registration fee on the chattel mortgage. It is argued that since the property described in the mortgage included leases and leasehold estates of elevators on railroad rights of way, an interest in real estate was conveyed within the meaning of G. S. 1949, 79-3101, and that a registration fee was due pursuant to G. S. 1949, 79-3102. The contention is without merit. The Hills owed but one debt to Fourth which was evidenced by their promissory note in the amount of $186,000. That note was secured by "real estate and chattel mortgage covering properties located in Harvey, Sedgwick and Butler Counties, Kansas." Those mortgages were first recorded in Butler County and a mortgage registration fee of $465 upon the principal debt of $186,000 was paid in that county. Where a mortgage of real estate covers properties situated in two or more counties, the registration fee shall be paid to the officers of the county where it is first presented for record (G. S. 1949, 79-3105). G. S. 1949, Ch. 79, Art. 31 does not require that a mortgage registration fee be paid twice upon the same debt. Indeed, the statute requires that the registration fee be paid only once on a single indebtedness secured by a mortgage upon real property, notwithstanding the debt may also be secured by a lien upon personal property. The trial court did not err in admitting Fourth's chattel mortgage in evidence, and it had jurisdiction to order the mortgage foreclosed.

## VI.

Poe contends the trial court erred in finding that the molasses tanks, the feed mixing equipment and fire alarm system he installed became a part of the mortgaged property. Those are the only fixtures Poe makes claim to in this court. Both leases from Sammie Hill to Poe provided that "any improvements made shall be and become a part of the premises." As previously indicated, the property described in those leases was identical to the property described in Fourth's mortgage, and that mortgage covered the entire assets of a going concern. That property and those assets were leased to

Poe. Fourth's mortgage covered "all fixtures and equipment." The trial court found the fixtures added by Poe became a part of the premises and inured to Fourth by virtue of its mortgage. There was substantial competent evidence to support that finding. However, Poe seeks to overcome the provision of the mortgage and leases by claiming that he, as lessee, and as attorney in fact for Sammie Hill, had agreed he could remove the fixtures. This highly interesting position taken by one who knowingly acted in a dual capacity representing divergent interests, was not accepted by the trial court. That again was conflicting evidence and the trial court resolved it in favor of Fourth.

## VII.

Poe next contends that he had a prior lien to Security's mortgage on Sammie Hill's cattle resulting from the advancement of $107,000 to purchase feed (2 Am. Jur. Agency, § 313, p. 245); that Security had a valid mortgage upon those cattle and it became necessary from time to time to sell them to pay that debt; that Poe surrendered his prior lien to Security to permit those sales, and Security agreed to subrogate its rights under Sammie Hill's mortgage of December 13, 1954, which was a first and prior lien on the property described since Fourth failed to file its renewal affidavits on or before December 11, 1954; that Security was a subsequent mortgagee in good faith (G. S. 1949, 58-303), and, since Sammie Hill's debt to Security was subsequently paid, he (Poe) was entitled to be subrogated to its prior rights to the property described in Fourth's mortgage. The contention is based upon an erroneous premise and lacks merit. The trial court found that Security had knowledge of Fourth's prior existing mortgage when Poe delivered Sammie Hill's mortgage, and concluded as a matter of law that Security was not a subsequent mortgagee in good faith within the meaning of G. S. 1949, 58-303.

A subsequent mortgagee with notice of a prior existing mortgage is not a subsequent mortgagee in good faith under the statute. The terms "subsequent purchasers" and "subsequent mortgagees in good faith" as used in G. S. 1949, 58-303 mean only purchasers and mortgagees who purchase or take their mortgages after the expiration of two years from the filing of the mortgage without notice of the existence of prior mortgages. (*Corbin v. Kincaid,* 33 Kan. 649, 7 Pac. 145; *Swiggett v. Dodson,* 38 Kan. 702, 17 Pac. 594; *Howard v. National Bank,* supra; *Geiser v. Murray,* 84 Kan. 450, 114 Pac. 1046.) Mr. Webber, a vice president of Security, testified he knew

of Fourth's prior existing chattel mortgage when Poe delivered Sammie Hill's mortgage in December, 1954. Furthermore, Fourth filed its renewal affidavits January 25, 1955, prior to Security's acceptance in April, 1955, of the Sammie Hill Mortgage and under any conceivable situation Security was not a subsequent mortgagee in good faith.

Subsequent to trial Sammie Hill's indebtedness to Security was paid. Thereafter, it was Security's duty to cause a satisfaction thereof to be entered of record. (G. S. 1949, 58-308.) Security had nothing to assign, consequently, Poe could not achieve subrogation. There was ample evidence to support the trial court's findings that Security was not a subsequent mortgagee in good faith within the meaning of the statute. Since Poe's right to subrogation depended upon Sammie Hill's mortgage to Security being prior to Fourth's, which it was not, his contention must fail.

## VIII.

Sammie Hill asserts the decree of foreclosure clogged his equity of redemption. He argues that Fourth's chattel mortgage describing certain grain elevators situated upon railroad rights of way and the leasehold estates on which the elevators were erected, conveyed an interest in real estate; that G. S. 1949, 60-3439 provides where real property is sold under an order of sale, the defendant owner is entitled to a right of redemption, and cites *Ehrsam & Sons Mfg. Co. v. Rice*, 153 Kan. 483, 112 P. 2d 95. We do not agree, nor do we think that case decisive of the question presented here. That was an action to foreclose a mechanic's lien for materials furnished to construct a grain elevator situated upon a railroad right of way and a leasehold estate owned by Rice. It was held that a leasehold interest is sufficient to support a mechanic's lien, and that pursuant to G. S. 1949, 60-1408, which provides where judgments are rendered to enforce such liens, the property shall be sold as in other cases of sales of real estate, and under G. S. 1949, 60-3439 the defendant owner is entitled to a right of redemption.

Whether or not a particular transaction constitutes a chattel mortgage or some other distinguishable transaction depends on the intention of the parties as shown within the four corners of the instrument, and where unambiguous, by giving the terms thereof, their plain and ordinary meaning. (*Anderson v. Rexroad*, 175 Kan. 676, 679, 266 P. 2d 320; *Brungardt v. Smith*, 178 Kan. 629, 636, 290

P. 2d 1039.) In the instant case, the Hills' mortgage to Fourth was unambiguous, and expressly described the properties as personal property and provided for their sale without equity of redemption. Moreover, that the Hills and Sammie Hill treated the properties as chattels is evident—the Hills by describing them as personal property in their mortgage to Fourth, and Sammie Hill, when he accepted a bill of sale for those properties. In *Docking v. Frazell,* 38 Kan. 420, 17 Pac. 160, it was held that parties to a chattel mortgage may agree that a building remain personal property, and when foreclosed, a sale thereunder conveys the property to the purchaser at the time of sale.

In *Denny v. Van Dusen, Adm'r,* 27 Kan. 437, 440, we held that parties to a chattel mortgage may agree upon the method of disposal of the mortgaged property. In that case there was an agreement between the mortgagor and mortgagee that the mortgaged property be sold in a different manner than provided for in § 17 of the chattel-mortgage act (G. S. 1949, 58-309), and the question was whether such an agreement was valid. Mr. Justice Brewer prepared the opinion for the court, and said:

". . . The contract is valid; there is no statute forbidding it; it is not against public policy, and would oftentimes increase the value of the mortgaged property to the mortgagor as security, without in any manner prejudicing any substantial rights. Why should not the owner of personal property, who may sell absolutely or conditionally, and impose such conditions as the parties may agree upon, or give it away, providing it be not done in fraud of creditors—why should not such owner be permitted to mortgage his property upon such conditions as he sees fit? Freedom in commercial transactions is always to be encouraged, providing only, that such freedom does not trespass upon any statute, do any wrong to the public, or work any injustice to the parties. It would often be of great value to the mortgagor if he could insert a valid stipulation that the mortaged property, when taken possession of by the mortgagee, should be sold in a certain market, or at a certain time, or upon certain conditions. To deprive him of such right would render his property less valuable for the purpose of security, and perhaps prevent him from obtaining such a loan as his necessities require. . . ." (l. c. 440, 441.)

Rights under a chattel mortgage are determined by their own provisions and by statutes relating thereto (*National Bond & Investment Co. v. Midwest Finance Co.,* 156 Kan. 531, 537, 134 P. 2d 639), and we find nothing in the statute precluding a mortgagor from agreeing to waive a right to redeem following condition broken and sale of the property.

Under the facts and circumstances presented, the trial court did

not err in directing that the properties be sold without equity of redemption.

## IX.

Sammie Hill lastly contends he was entitled to have the action stayed during the period of his military service under the provisions of the Soldiers' and Sailors' Civil Relief Act. (50 App. U. S. C. A. § 521.) That section reads:

"At any stage thereof any action or proceeding in any court in which a person in military service is involved, either as plaintiff or defendant, during the period of such service or within sixty days thereafter may, *in the discretion of the court* in which it is pending, on its own motion, and shall, on application to it by some person or some person on his behalf, be stayed as provided in this Act [sections 501-548 and 560-590 of this Appendix], unless, *in the opinion of the court*, the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service. Oct. 17, 1940, c. 888, § 201, 54 Stat. 1181." (Emphasis supplied.)

In *State v. Goldberg*, 161 Kan. 174, 178, 166 P. 2d 664, we held the wording of the act forces the conclusion that the granting or refusal of a continuance is a question for the trial court's discretion. (For additional authorities showing courts' construction of the act as vesting discretion in the courts, see notes of decisions beginning at p. 546 in 50 App. U. S. C. A., and p. 134 in the 1956 cumulative pocket part.)

Did the trial court abuse its discretion? The record shows that from the very first Mr. George Stallwitz, an able and experienced member of the Bar of this state, was appointed to represent Sammie Hill and no showing was made that Sammie Hill's ability to prosecute his defense was materially affected by reason of his military service. Mr. Stallwitz had several conferences with him relative to his defense, and filed an answer on his behalf; Poe, his attorney in fact, was in court and testified on his behalf at practically every hearing; and, Mr. Stallwitz' affidavit of October 31, 1955, attached to his motion for continuance, set forth the facts Sammie Hill would have testified to had he been present, which affidavit was part of the files of the case. We are not convinced Sammie Hill was prejudiced by the denial of his applications to stay the proceedings and grant an indefinite continuance, and conclude the trial court did not abuse its discretion.

The record has been thoroughly reviewed and we find no error. The judgment is affirmed. It is so ordered.