**LAGUNA GATUNA, INC., Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 96–157 L.

United States Court of Federal Claims.

Sept. 13, 2001.

J. Scott Detamore, Denver, Colorado, for Plaintiff.

Lori Caramanian, U.S. Department of Justice, Washington, D.C., with whom were Terry Petrie, United States Department of Justice, Denver, CO, Grant L. Vaughn, United States Department of Interior, of counsel, for Defendant.

## OPINION

BRUGGINK, Judge.

Plaintiff, Laguna Gatuna, Inc., owns various interests in a dry lake bed, Laguna Gatuna, located in New Mexico. It has brought this action pursuant to the Fifth Amendment of the Constitution for compensation for a taking of these interests by the United States, acting through the Environmental Protection Agency ("EPA") and the Bureau of Land Management ("BLM"). Trial was conducted from February 20 through 21, 2001, in Albuquerque, NM. The court ordered post trial briefing. The matter is now fully briefed.

## BACKGROUND [1]

Laguna Gatuna is one of many playa lakes located in Lea County, New Mexico, just outside of the Permian Basin—one of the richest oil deposits in the United States. Laguna Gatuna is a lake virtually in name only. It consists of approximately 400 acres, yet it is not hydrogically connected to any other water source. The floor of the lake bed consists of a thick layer of red clay that is impermeable to water. Consequently, occasional water run-off from the surrounding area collects in the basin. The water quickly evaporates, leaving behind a slurry of salt and other minerals.

In the late 1960s, Dr. Larry Squires,[2] owner of Snyder Ranches, Inc., plaintiff's predecessor in interest, received word that local oil companies were interested in using playa lakes for disposing oil field brine.[3] Snyder Ranches owned or had BLM and state leases on between four to five hundred sections of land in the vicinity of Laguna Gatuna. In 1969, Dr. Squires, through his company Pollution Control, Inc. ("PCI"), obtained a special land use permit ("SLUP") from BLM to dispose of oil field brine at the lake. The SLUP granted PCI use of 450 acres of public land, including the portion of the lake managed by BLM. Upon review of the SLUP prior to its expiration, BLM determined that a renewal of the permit should take the form of a right-of-way because PCI's use of the land was considered a long-term rather than a temporary use. PCI also obtained a business lease from the State of New Mexico to 80 acres of land on the Southeast corner of the playa (No. BL—745) and permits from the State of New Mexico for the disposal of brine in Laguna Gatuna.

On October 19, 1979, pursuant to Title V of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1761–1771 (1994), BLM issued a right-of-way to PCI. The grant became effective on May 29, 1979, and was for a 30–year term. It authorized PCI's use of approximately 450 acres of public land, including parts of the lake, as a salt water disposal facility for brine produced from oil and gas wells in the vicinity.

In July 1981, PCI obtained an oil treatment plant permit from the State of New Mexico Oil Conservation Commission. The permit allowed PCI to construct and operate the plant in the E/2NW/4 of Section 18, Township 20 South, Range 33 East, NMPM, Lea County, New Mexico. Over the next several years, PCI installed facilities for oil field transportation companies to transport disposed water from the point of production. The facilities for the heat treating oil plant were installed on the section 18 lands northwest of the lake which were owned in fee by Snyder Ranches, Inc. The oil brine was initially put into tanks where the oil naturally separated from the water. These separation tanks were located on the Snyder Ranches property in section 18. Following separation, the water was discharged into holding tanks and then to the lake, where it eventually evaporated. The oil was skimmed off the top of the tanks and was treated in the oil treatment plant. It was then reconstituted into higher grades of oil by mixing it with condensate from local gas wells. All separation tanks and the oil treatment plant were located on the section 18 lands owned by Snyder Ranches.

In 1987, PCI requested a determination from the EPA as to whether the lake was considered "waters of the United States" within the meaning of the Clean Water Act ("CWA") 33 U.S.C. §§ 1311 *et seq.* (1988). In a letter dated August 13, 1987, James L. Collins, Associate Regional Counsel for EPA, responded:

> Based on the information you submitted, EPA would not consider [the lake] to be "waters of the United States" as that term is defined under 40 C.F.R. § 122.2. Playa lakes may be considered "waters of the United States" if they "would affect or could affect interstate or foreign commerce." You indicate in your letter that

---

1. The facts are drawn from the undisputed proposed findings of facts submitted prior to trial as well as facts presented at trial.

2. Dr. Squires is a veterinarian.

3. Oil field brine is water that is brought to the surface during the extraction of oil. It consists mostly of salt water that has been injected into the well in order to stimulate recovery.

there are no recreational, industrial, or other uses that could effect interstate commerce, and that [the lake] is not hydrogically connected to "waters of the United States." Based on this understanding of the facts, EPA agrees that [the lake] would not be considered "waters of the United States."

In July 1988, PCI successfully sought additional investors in order to expand its business activities. As a result, Laguna Gatuna, Inc. (Laguna) was formed, acquiring by assignment all the right, title and interest of PCI, including the BLM right-of-way[4] and the State of New Mexico business lease No. BL—745. The New Mexico lease was due to expire on October 27, 1989. In addition, in August of 1988 Dr. Squires and PCI transferred to Laguna all of the permits they had received from the State of New Mexico and the Oil Conservation Division for the purpose of allowing salt water disposal at the lake.

As part of the effort to consolidate all the disposal operation interests into Laguna Gatuna, on August 15, 1998 Snyder Ranches entered into a ten-year lease with Laguna Gatuna for approximately 280 acres of Snyder land surrounding the western side of the lake. The rental fee was one dollar per year. The lease provided that at some point within the ten year period Laguna Gatuna would purchase the property for $200,000.00. Dr. Squires testified that the lease purchase agreement was intended by the parties to be treated as essentially a delayed fee transfer in order to provide Dr. Squires with a better security interest.

In October of 1989 the Land Commissioner of the State of New Mexico determined that, upon the expiration of Laguna's lease, the state would prefer to sell the 80 acres that it was leasing to Laguna. Laguna was willing to buy. In order for the State to sell, however, the property first had to be surveyed, appraised, and advertised. It could then be sold to the highest bidder at a public auction.

Because of the sale likelihood, neither party wanted to enter into another five year lease. Consequently, on November 18, 1989 Laguna Gatuna entered into an agreement with the State of New Mexico to lease the 80 acres on a month to month basis, until such time as a sale, presumably to Laguna, could be consummated. The month to month arrangement continued for approximately one year, during which time the state prepared for the public auction. In a letter dated July 2, 1990 the Commissioner of Lands of the State of New Mexico informed Dr. Squires that the month to month lease would end on September 20, 1990, the scheduled date of sale.

On September 20, 1990 the State of New Mexico conducted the sale. Laguna Gatuna was declared to be the highest bidder for one of the two 40 acre parcels being sold. Pronghorn Company, another produced-water disposal company, was declared the highest bidder on the other tract of land. Dr. Squires paid for the forty acres on behalf of Laguna Gatuna. A patent for the property did not actually issue until December 11, 1992, however. In the interim, the State held the funds for payment in a suspense account. It is not clear from Dr. Squires testimony whether or not he paid taxes on the property.[5]

Laguna Gatuna continued to make substantial capital improvements to the disposal facility during this period. This included installation of pipelines from the lake to the local oil and gas wells to reduce reliance on trucking the brine.

Meanwhile, in the course of studying playa lakes in New Mexico, EPA discovered dead birds in the vicinity of the playa. On May 22, 1992, EPA issued plaintiff a Cease and Desist Order ("Order") directing the plaintiff to stop all operations involving the disposal of oil field brine at the lake because the agency was of the view that it was in viola-

---

**4.** Defendant initially argued that the BLM right-of-way was never transferred to Laguna and therefore it did not have a property interest in the right-of-way. At trial, however, defendant conceded that the BLM right-of-way was transferred, and that it should be considered a compensable property interest.

**5.** When asked at trial whether or not Laguna paid taxes on this property, Dr. Squires replied that he could not recall whether they did or not.

tion of section 301 of the CWA. The Order stated in part:

> EPA has not authorized the Respondent's discharges of pollutants in accordance with section 402 of the Clean Water Act, 33 U.S.C. Part 1242. EPA has in fact prohibited discharges of Onshore Subcategory wastewater pollutants to waters of the United States through issuance of National Pollutant Discharge Elimination System ("NPDES") permit GNM320000. The Respondent nevertheless continues to discharge said pollutants to [the lake], thus violating Section 301(a) of the Clean Water Act, 33 U.S.C. Part 1311(a).

In its order, EPA also made a factual finding that the lake met the definition of "waters of the United States" as set forth in 40 C.F.R. § 122.2:

> [The lake] provides a significant nesting, feeding and loafing area for migrating birds, including shorebirds, ducks, coots, grebes, and raptors. [The lake] is moreover capable of receiving discharges of pollutants by multiple industries engaged in interstate commerce. But for the currently polluted State (sic), [the lake] would also be capable of use by agricultural industries engaged in interstate or foreign commerce, including cattle ranching. Due to those uses and potential uses, [the lake] is a "water of the United States" as defined at 40 C.F.R. Part 122.2.

The Order also advised plaintiff that if it failed to comply with the order, it would be subject to criminal or civil penalties pursuant to the CWA.[6] Plaintiff ceased all disposal operations as of May 23, 1992. It eventually sold for salvage value some of the improvements, including the pipeline.

Plaintiff filed an action in the United States District Court for the District of New Mexico, challenging EPA's cease and desist order. In an order dated April 8, 1994, the district court dismissed the complaint, holding that it did not have jurisdiction because EPA orders issued pursuant to the CWA are not subject to judicial review. This decision was affirmed by the United States Court of Appeals for the Tenth Circuit on June 20,

1995. *See Laguna Gatuna, Inc. v. Browner,* 58 F.3d 564 (10th Cir.1995). The Supreme Court later denied *certiorari.*

On March 20, 1996, the present complaint was filed. Plaintiff claims that EPA's order of May 1992 declaring the playa to be "waters of the United States" constituted a regulatory taking of plaintiff's interests in the playa. Plaintiff also alleges that it had no further means by which to challenge EPA's determination that the playa constituted "waters of the United States" and thus the actions of the EPA have resulted in a taking of its private property without just compensation required by the Fifth Amendment.

On January 9, 2001, shortly before trial was to begin, the United States Supreme Court held in an unrelated action that the Army Corps of Engineer's rule extending the definition of "navigable waters" under the CWA to include intrastate waters used as habitat for migratory birds exceeded the authority granted to the Corps by Congress under the CWA. *See Solid Waste Agency of Northern Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("*SWANCC* ").

The EPA read the *SWANCC* decision as undermining its authority to regulate playas such as Laguna Gatuna. Accordingly, it voluntarily withdrew the May 9, 1992 cease and desist order directed to plaintiff. In addition, in light of the *SWANCC* ruling, defendant significantly altered its defense in this action. Defendant now argues that the EPA was acting outside the scope of its congressionally mandated authority when it ruled that Laguna Gatuna was considered "waters of the United States." Because the EPA, like the Corps of Engineers, relied upon the presence of migratory birds in the playa, defendant argues that the EPA was not only in error, but was acting *ultra vires.* It follows, according to defendant, that the Government did not "take" plaintiff's property for public use and thus could not have violated the Fifth Amendment takings clause. It is sufficiently wedded to this view that at

---

6. Pursuant to the CWA, a person "who willfully or negligently violates [the CWA] shall be pun- ished by fine ... or imprisonment ... or both." 33 U.S.C. § 1319(c)(1). *See also id.* at § 1319(d).

trial it announced its willingness to concede certain elements of a regulatory taking with respect only to the BLM right-of-way: that plaintiff owned the right-of-way and that it was a compensable property interest at the time of the alleged taking; and that plaintiff had a reasonable, investment-backed expectation in the right-of-way.

## DISCUSSION

 The Supreme Court has identified three inquiries necessary to finding a regulatory taking: the extent to which the governmental action interferes with distinct, investment backed expectations; the character of the governmental action; and the extent of economic impact on the claimant. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[7] Before assessing whether the test is met as to any of the property interests involved here, we must first consider the threshold defense that the actions of the EPA were unauthorized.

The Takings Clause prevents the Government from taking private property *for public use* without compensation. In applying this requirement, the Supreme Court has held that the action causing the alleged taking must be "otherwise proper." *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Destruction or seizure of property for purposes that are arguably not a public "use," however, have not been viewed as takings, for example, when government exercises its police power to protect public health or safety, even when it leads to the total destruction of private property. *See, e.g., Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928). Similarly, seizure of private property implicated in the commission of crimes is not viewed through the prism of the takings clause. *See Crocker v. United States*, 37 Fed.Cl. 191, 195, *aff'd*

125 F.3d 1475 (1997). The same is true when public officials act outside the scope of their authority. Such action is viewed as tortious and not susceptible to a takings analysis. *See Langford v. United States*, 101 U.S. 341, 342, 25 L.Ed. 1010 (1879). *See generally* John Echeverria, "Takings and Errors," 51 Ala. L.Rev. 1047 (2000).

This limitation on takings analysis has been summarized by the requirement that only "authorized government action" can form the basis of a takings claim. *See Florida Rock Indus., Inc. v. United States*, 791 F.2d 893 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Indeed, the Federal Circuit has required that a takings claimant concede the authority of agency officials to act. *Id.* at 899. The question posed by this case is whether the cease and desist order of the EPA satisfies the "authorized government action" element of a compensable taking.

Plaintiff cites the recent decision of the Federal Circuit in *Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed.Cir.1998). *Del-Rio* involved a question of whether the Department of Interior improperly construed a statute to give an Indian tribe the right to control surface access to mineral interests. This court had held that, because the plaintiff was challenging the correctness of the agency's interpretation of its duties under the applicable statutes, plaintiff's remedy was an action in district court to have the government's interpretation set aside. The Federal Circuit reversed and remanded, holding that:

> [i]n a case such as this one, in which the alleged taking consists of regulatory action that deprives a property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, i.e., if their actions are a 'natural consequence of Congressionally approved measures,' *NBH Land Co. v. United States*,

---

7. We note, alternatively, that the Supreme Court teaches that a complete destruction of value, which plaintiff asserts, can be a categorical taking, arguably not prompting application of the

other *Penn Central* factors. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

217 Ct.Cl. 41, 576 F.2d 317, 319 (1978), or are pursuant to 'the good faith implementation of a Congressional Act,' *Southern Cal. Fin. Corp. v. United States,* 225 Ct.Cl. 104, 634 F.2d 521, 525 (1980).

146 F.3d at 1362. The circuit court discussed at length the difference between government conduct that may be "illegal" but "authorized," and therefore could be the subject of a takings claim, and conduct that is "illegal" but "unauthorized," which on the other hand could not be the basis of takings claim. The court described an action that falls into the latter category as "ultra vires, i.e., it was either explicitly prohibited or was outside the normal scope of the government officials' duties." *Id.* at 1363 (citing *United States v. Great Falls Mfg. Co.,* 112 U.S. 645, 20 Ct.Cl. 522, 5 S.Ct. 306, 28 L.Ed. 846 (1884)). The federal government will not be held liable for acts of its agents which are *ultra vires:* "[W]hen a government official engages in ultra vires conduct the official, 'will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government founded upon the Constitution.'" *Id.* at 1362 (quoting *Hooe v. United States,* 218 U.S. 322, 335, 46 Ct.Cl. 655, 31 S.Ct. 85, 54 L.Ed. 1055 (1910), citing *United States v. North Am. Transp. & Trading Co.,* 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920)). The Federal Circuit went on to clarify that "[n]either the Supreme Court nor this court has held that government conduct is 'unauthorized,' for purposes of takings law, merely because the conduct would have been found legally erroneous if challenged in court." *Id.* Because the EPA was acting within the general scope of its statutory mandate, the question of authority was not relevant in the takings context. *See also Eyherabide v. United States,* 170 Ct.Cl. 598, 345 F.2d 565 569 (1965).

Although the effect of *Del–Rio* was to permit the plaintiff, in the context of a taking claim, to challenge the validity of the government action which allegedly constituted a taking, it must be recognized that in that case, the validity of the action and the question of plaintiff's ability to access its land were inextricably related. It was necessary, in assessing the taking claim, to determine the extent of the parties' conflicting claims to access and surface control. That in turn required a determination of the validity of the agency's decision to give a veto over access to the tribe. *See id.* at 1364.

More recently, in *Rith Energy, Inc. v. United States,* 247 F.3d 1355 (Fed.Cir.2001), the Federal Circuit had occasion to revisit its holding in *Del–Rio.* The plaintiff in *Rith,* in asserting a taking, challenged the correctness of the Office of Surface Mining's decision to deny mining permits. A challenge to that administrative determination is available in the district court. Unlike *Del–Rio,* in which the question of the correctness of the agency action was preliminary to the taking issue, in *Rith,* the plaintiff was asserting that the taking was co-extensive with the allegedly incorrect decision to deny a permit. The challenge, in other words, was identical to and no greater than a typical action in district court under the Administrative Procedures Act, 5 U.S.C. §§ 701–706. (1994). The court took pains to emphasize that *Del–Rio* did not alter the traditional requirement in a takings case that the plaintiff must "litigate its claim on the assumption that the administrative action was both authorized and lawful." *Id.* at 1366. It is thus only when the government action is, in the words of *Eyherabide,* "wholly unauthorized," 345 F.2d at 569, that the defense applies.

There are several reasons we cannot accept the Government's argument of "lack of authority" in these circumstances. First, we begin with the test applied in *Florida Rock:* for purposes of this action, and unlike *Rith,* plaintiff has conceded the validity of the agency action. It could hardly do otherwise. This court would not have had jurisdiction to hear a direct challenge to the validity of the order. Such an action would have been brought, and indeed was brought, in district court pursuant to 28 U.S.C. § 1331 and the Administrative Procedures Act. The plaintiff attempted to have the decision reversed in district court, but the action was dismissed. The validity of the EPA order is, therefore, not before the court. The only reason to believe that the order should not have been entered is the agency's own assessment that

the *SWANCC* case calls the order into substantial question.

Second, the EPA's withdrawal of its cease and desist order comes nearly nine years too late for plaintiff's purposes. The plaintiff alleges that, during a period when the EPA had not conceded the invalidity of its actions, the property lost all economically beneficial use. At a minimum, during the period when the agency's authority was unquestioned, plaintiff would be able to claim a temporary taking.

Third, we note that the decision in *SWANCC* only directly affected the authority of the Army Corps of Engineers, not that of the EPA. The Court ruled that the Army Corps of Engineers exceeded its authority in extending the definition of "waters of the United States" to include the migratory bird rule as stated in 33 C.F.R. § 328.3(a)(3). In this case, the EPA did not rely on that regulation, but instead on 40 C.F.R. § 122.2, which was not directly implicated by *SWANCC*. The EPA also concluded that the playa was "capable of receiving discharges of pollutants by multiple industries engaged in interstate commerce." The regulation relied on by the EPA describes intrastate waters that are considered "waters of the United States" as follows:

Waters of the United States or waters of the U.S. means:

. . . .

(c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, *playa lakes,* or natural ponds the use, degradation or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

(1) Which are or could be used by interstate or foreign travelers for recreational purposes;

(2) From which fish or shellfish are or could be taken and sold interstate or foreign commerce; or

(3) Which are used or could be used for industrial purposes by industries in interstate commerce;

40 C.F.R. § 122.2 (emphasis supplied).

The government has not argued that the EPA did not have the authority to issue a cease and desist order based its determination that the playa fell within the definitions of waters of the United States listed in 40 C.F.R. § 122.2. There is no reason to believe, and the agency has not asserted, that the May 22, 1992 order declaring Laguna Gatuna, to be "waters of the United States" was not within the general scope of the agency's duties, or that it was not a 'natural consequence of Congressionally approved measures.' *Del–Rio,* 146 F.3d at 1362. Nor is there any reason to question the agency's good faith determination that the playa provided habitat for migratory birds, and that it, in good faith interpreted its duties under the CWA as extending to isolated playas.[8] We therefore reject the argument that the actions complained of were not authorized within the meaning of the Takings Clause.

*Was Plaintiff's Property Taken?*

The first line of inquiry in all takings cases must be to identify the "property" allegedly taken for public use because the Takings Clause only protects juridically recognized property interests. *See M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir. 1995). Plaintiff asserts that four different property interests were taken when the EPA issued its cease and desist order in May of 1992. The first three are interests in real property; the last consists of permits.

A. *Bureau of Land Management Right–of–Way No. NM 36791*

This particular parcel of land includes the following land in T.20 S., R. 33 E., of the

---

8. When referring to the Clean Water Act, Congress specifically stated, "Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter." 33 U.S.C. § 1251(d) (1994). Government agencies are specifically authorized by Congress to promulgate rules consistent with their statutory authorities. *See* 5 U.S.C. § 553 (1994). It was under this general scope of authority that the EPA initially enacted 40 C.F.R. § 122.2, and later relied on it as authority for issuing the cease and desist order to Laguna.

New Mexico Prime Meridian, Lea County, New Mexico:

> S1/2SE1/4 of sec.7; W1/2NW1/4NW1/4 and NW1/4SW1/4 of sec. 17; NE1/4 and N1/2SE1/4 of sec. 18; N1/2NE1/4NE1/4 and that part of the S1/2NE1/4NE1/4 lying north of the U.S. Highway 62–180 of sec. 19, containing 450 acres, more or less.

Defendant stated in its brief that as to the right of way, "the United States concedes that Plaintiff has met its burden of proof under the *Penn Central* regulatory takings test." Def. Post Trial Brief at 6. Defendant's comments at trial suggest that this concession does not constitute an admission of liability. Apparently, defendant tempers these words with the argument that Laguna Gatuna's assets cannot be separated from those of Dr. Squires, and that therefore the economic impact element, when applied to the assets of both Laguna Gatuna and Dr. Squires, is not met. For present purposes, it is sufficient to note that defendant apparently recognizes that plaintiff owned the right-of-way, that it is an interest susceptible to "taking," and that, if viewed in isolation, the actions of the EPA took all value of the right of way.

### B. *The Snyder Ranches Property*

■ One of the interests allegedly taken is the 280 parcel that was the subject of the August 15, 1988 lease between Snyder Ranches, Inc. and Laguna Gatuna for the use of this property. At the time the lease agreement was entered into, a portion of the above described property was being used for the disposal of produced water. There is some disagreement between the parties as to the plaintiff's interest in this land.

The relevant document is titled, "Lease Agreement." On its face, it constitutes a lease for a term of ten years. The rental fee was one dollar per year. Receipt of the entire ten year rental was acknowledged at the time the lease was signed.

The agreement also contained, however, the following option to purchase:

> 3. *PURCHASE.* At any time during the ten year period at Laguna's option, Laguna shall purchase from Snyder the above described property for a consideration of $200,000.00 payable upon such terms and conditions that may be agreed upon between the parties; provided, however, that within the ten year period, the purchase shall have been consummated and the payment in full shall have been received by Snyder.

There is no proof that the option was exercised prior to the alleged date of taking.

Although Dr. Squires referred to the document as a lease agreement during his trial testimony, he also testified that he really intended a fee transfer. He used the form of a lease agreement with an option to purchase in order to retain a security for the unpaid $200,000.00 purchase price. In the event of default, in other words, he could have avoided foreclosure proceedings.

Plaintiff argues that this agreement was in the nature of an executory contract for purchase of the land, and that, in New Mexico, a vendee in an executory contract for purchase is considered the equitable owner of the fee. *See Southwest Land Investment, Inc. v. Hubbart,* 116 N.M. 742, 867 P.2d 412 (1993); *Marks v. City of Tucumcari,* 93 N.M. 4, 595 P.2d 1199, 1200 (1979); *In re Anthony,* 114 N.M. 95, 835 P.2d 811 (1992); *C & L Lumber and Supply, Inc. v. Texas American Bank/Galeria,* 110 N.M. 291, 795 P.2d 502 (1990).[9] Defendant argues that the agreement is, at most, a lease with an option to purchase. If that is what it is, then under New Mexico law "no estate in the lessee is created, beyond his leasehold interest and there is no sale of the property until the

---

9. *See also Mesich v. Board of County Com'rs of McKinley Co.,* 46 N.M. 412, 129 P.2d 974, 976 (1942), in which the court observes the following:

> In law the effect of a contract whereby the owner agrees to sell and another agrees to purchase a designated tract of land, the vendor remains the owner of the legal title to the land; he holds the legal title, 1 Pomeroy's Equity Jurisprudence, § 367. But, in equity the vendee is held to have acquired the property in the land and the vendor as having acquired the property in the price of it. The vendee is looked upon and treated as the owner of the land and the equitable estate thereof as having vested in him. He may convey it or encumber it, devise it by will and on his death it descends to his heirs and not to his administrators.

option is exercised." *Hueschen v. Stalie,* 98 N.M. 696, 652 P.2d 246, 248 (1982), (citing *Town & Country Real Estate v. Wales,* 602 P.2d 727 (Wash.App.1979)); *Fourth National Bank in Wichita v. Hill,* 181 Kan. 683, 314 P.2d 312, (1957).

This is not an equitable proceeding. It is a proceeding in law in which Laguna Gatuna has the obligation to prove title. Plaintiff has proved something of a hybrid between a purely executory contract for purchase and a lease agreement with an option to purchase. We hold that the document is insufficient in the context of a takings claim to establish any rights other than those of a lessee.[10]

## C. *State of New Mexico Lands*

■ The third property interest allegedly taken is one of the parcels of land Laguna Gatuna attempted to purchase from the State of New Mexico. The relevant Notice of Public Auction for Sale of State Lands specifically stated that, "[t]he Commissioner shall issue patents with respect to each of the subject lands to each respective successful bidder upon receipt of full payments of the respective purchase price and the costs described in this notice and upon satisfaction of all other requirements."

The property was auctioned on September 20, 1990. Laguna was declared to be the highest bidder on one of the 40 acre parcels. Dr. Squires paid the money to the land commissioner on that day. However, the state of New Mexico did not deposit that money into the treasury. Instead, the money was placed in a suspense account. In New Mexico law, money in a suspense account is not the absolute property of the state. *See* N.M. Stat. Ann. § 6–10–41 (1978). Suspense accounts are used when the money is tendered, "in evidence of good faith to secure the performance of any contract or agreement with the state or with the state or with any department, institution or agency of the state, which money has not yet been earned so as to become the absolute property of the state ...." N.M. Stat. Ann. § 6–10–3. Because the money was not deposited into the state

treasury the land records did not show a transfer until December 11, 1992.

The notice also stated that, "[e]ach Purchaser will be required to obtain a Disposal Authorization Permit from the Oil Conservation Division if the property shall continue to be used as a salt water disposal site." In a letter dated August 30, 1991, almost a year after the initial auction and sale of the land took place, the state Oil Conservation Division ("OCD")informed Dr. Squires that he did not have the necessary permit as required by the Notice of Public Auction. Dr. Squires testified at trial that he disagreed with the OCD's assessment of the status of his permit. He said, however, that he did not pursue the matter further because he was aware, even at that time, that the EPA might issue an order prohibiting him from continuing to use that facility. Plaintiff never obtained the OCD permit, although he did ultimately obtain a patent to the land after the date of alleged taking. Dr. Squires testified that it was understood that the permit was not really necessary, given plaintiff's limited use of the land for its own purposes.

It was apparent from trial testimony that there was a level of informality about this transfer. Unfortunately, that informality caused both the plaintiff and the state land office to less than vigorously pursue consummation of the sale. As a result, the patent was not issued until two years after the actual date of the sale, for no apparent reason other than confusion about whether plaintiff needed the OCD permits.

Ms. Padilla, the state land office representative at trial, was under the impression that title had not actually passed to plaintiff. When asked specifically about the time period between the sale and the issuance of the patent, Ms. Padilla stated that the State of New Mexico probably still had rights of possession because title had not passed.

> Q. Was, during this entire period of time was *Laguna Gatuna, Inc.* and its personnel in exclusive possession and control of those premises?

**10.** We note that defendant's argument here is somewhat at odds with its contention that the value of Laguna Gatuna's property has to be

diluted by consideration of the property of the person it contends is the real party in interest, Dr. Squires.

A. I think so. It was on hold. It was referred to as sale on hold by my boss Please Glenn.

Q. And the state had no right of possession at that time, is that also true, for use?

A. I don't know. We probably did. I don't have any—

Q. You don't have any idea though, do you?

A. Unless we went ahead with the other Section 19 was left out until Abbott got his money back in '91. So, I don't know if we had possession. I mean it was not titled over so it was still ours.

Furthermore, plaintiff's expert appraiser, Ms. Tere Boyd, testified that according to her research of the county records the state was listed as the owner of the property at the time of the taking and there were no records that plaintiff had ever paid taxes on the property. Ms. Boyd also testified that when she was first asked to appraise the property Dr. Squires told her that he thought the land was to be treated as a leasehold interest.

In a letter dated August 28, 1992, three months after the issuance of the cease and desist order, Mr. J.W. Neal, plaintiff's attorney at the time, wrote the following to the State Land Office,

In accordance with your recent conversation with Larry Squires and myself, this is to request the Commissioner to go ahead and consummate the sale of certain lands of the state purchased by Laguna Gatuna. All monies have heretofore been paid for the purchase. Any action had been withheld until the problem of the discharge permit could be ascertained.

. . .

As you recall the notice of sale published by the Commissioner stated it would be necessary for the successful bidder to obtain the appropriate disposal permits from the State. During the interim and due to the position now taken by the EPA, such disposal under their decision will be unlawful making it impossible for us to obtain the necessary permit.

We want to go ahead and consummate the sale regardless of the fact we are unable to obtain the necessary permit for disposal of produced water in order that the appropriate institution will receive the benefit of the sale.

It was not until several months after this letter was sent that the State issued the patent.

Defendant argues that because plaintiff's lease for this property was terminated on September 20, 1990 and the patent for the property purchased on that date was not issued until December 11, 1992, plaintiff had neither a leasehold interest nor a fee interest in the property at the time of the taking. Plaintiff counters that it owned a fee or equitable fee interest in the property at the time of the taking. It relies on New Mexico decisional law that a purchaser who has fully performed does not have to sue to convert his equitable title to a legal title in absence of a delivery of a deed. *See Tres Ladrones, Inc. v. Fitch,* 127 N.M. 437, 444, 982 P.2d 488 (N.M.Ct.App.1999); *Wooley v. Shell Petroleum Corp.,* 39 N.M. 256, 45 P.2d 927, 934 (1935). If full payment has been made on a purchase contract and all other conditions of the contract have been fulfilled then equitable title passes to the vendee regardless of whether or not the deed has been physically delivered. *See Garcia v. Garcia,* 111 N.M. 581, 808 P.2d 31 (1991); *Conway v. San Miguel County Board of Education,* 59 N.M. 242, 282 P.2d 719 (1955); *Albarado v. Chavez,* 36 N.M. 186, 10 P.2d 1102 (1932); *Val Verde Hotel Co. v. Ross,* 30 N.M. 270, 231 P. 702 (1924).

According to defendant, on the other hand, because the State of New Mexico put the funds into a suspense account and not directly into the state treasury, the money constituting payment for the land was not really the property of the state. Defendant also points out that a vendee with an equitable interest in land under a purchase contract is liable to the state for taxes on that property. *See Romero v. State,* 97 N.M. 569, 642 P.2d 172(1982); *Board of Equalization of the County of Bernalillo v. Heights Real Estate Co.,* 74 N.M. 101, 391 P.2d 328, (1964), whereas property that is still considered to belong

to the state is tax exempt. N.M. Const. Art. VIII, sec. 3. In this instance, there is no evidence that plaintiff paid taxes on the property.

In sum, the evidence undercuts proof of any recognized interest in the New Mexico lands. Dr. Squires was under the impression that Laguna Gatuna merely had a leasehold interest in the property, yet Laguna Gatuna was making no leasehold payments. Plaintiff's attorney acknowledged at the time that a precondition to the consummation of the sale-issuance of the OCD permit-had not taken place. The state land records indicated that the state was the owner of the land and that plaintiff had never been taxed on the property. The money that plaintiff paid to the land commissioner on the date of the sale was not deposited into the state treasury therefore it did not become property of the state. We conclude that the evidence is insufficient to establish in plaintiff any interest for purposes of the Takings Clause at the time of the order.

4. *New Mexico Oil Conservation Orders R–3725, R–3725A and R–6718.*

■ Finally, plaintiff asserts a taking for three permits issued by the OCD that allowed Laguna to dispose of 30,000 barrels per day of produced water into Laguna Gatuna. Defendant argues, among other things, that the Orders are not property interests that can give rise to a taking.

Licenses or permits are traditionally not treated as property subject to the Takings Clause. They are created by the government and can be cancelled by the government. They are normally not transferrable, or transferrable only with permission.[11] *See Bradshaw v. United States*, 47 Fed.Cl. 549, 553 (2000); *Hage v. United States*, 35 Fed.Cl. 147, 171 (1996); *Mitchell Arms, Inc. v. United States*, 26 Cl.Ct. 1 (1992), *aff'd* 7 F.3d 212 (Fed.Cir.1993). The government's argument is thus correct, so far as it goes. There

cannot be a separate claim for the "taking" of a permit. This does not mean, however, that the existence and validity of permits cannot be taken into account when valuing other recognized property interests, such as the BLM right-of-way or the leasehold of Snyder lands.

*Penn Central Takings Analysis*

■ Having established the nature of the private property interests in existence at the time of the taking, we must decide whether the particular facts of this case do in fact constitute a Fifth Amendment taking in the context of the three-part *Penn Central* test.

1. *Interference with Distinct, Investment–Backed Expectations*

The government conceded before trial that the plaintiff had distinct, reasonable investment-backed expectations to use the Snyder land leasehold and the BLM right-of-way for salt water disposal in Laguna Gatuna. We agree. Plaintiff had in place all the necessary permits from the State of New Mexico, with the exception of the OCD permit for the section 17 property, and was legally, under the state regulatory scheme, disposing of salt water on its property. In light of its 1987 inquiry to the regional counsel for the EPA, Laguna Gatuna had no reason not to make substantial investments in its operation. This expectation seems even more reasonable in light of the recent withdrawal of EPA's cease and desist order.

2. *Degree of Economic Impact*

The only issue at this point is whether the degree of economic impact suggests a taking occurred. ·Damages are not yet at issue. Laguna alleges that the cease and desist order caused a 100 percent destruction in value. With respect to pre-taking value, we have the testimony of Dr. Squires that, prior to the cease and desist order, Laguna Gatuna attempted to sell all of its assets, including

---

11. Defendant attacks the validity of the transfer of the OCD orders from PCI and Dr. Squires to Laguna. It argues that although Dr. Squires created paperwork to transfer all rights under these permits to Laguna Gatuna, he did not obtain the necessary written approval from the director of the OCD. Defendant, however, offered into evidence a letter dated August 30, 1991, in which the environmental bureau chief of the OCD acknowledged Laguna's rightful use of two of the three permits, and a limited right to use OCD Order R–3725–A. There was no evidence to the contrary.

the rights of way, leaseholds, and improvements. The listed price was $2.75 million, although Dr. Squires testified that he thought it was worth more. Its value was attributable to plaintiff's ability to dump brine. There was no contrary evidence.

According to plaintiff, no value remained. The trial testimony supported this contention as to the Snyder Ranch lease property and the BLM right of way. Dr. Squires, Ms. Boyd, plaintiff's expert, and Mr. Kenneth M. Smith, a local rancher, all testified that the only economically viable use for this land and the BLM right-of-way was for salt water disposal. That plainly must be true with respect to the right-of-way, which was limited to brine disposal. Ms. Boyd testified that, as a practical matter, plaintiff's interest in the land, whether viewed as a leasehold or fee interest, had no use other than for salt water disposal site. Because plaintiff could no longer use its property for that purpose, as of May 22, 1992, it was rendered effectively idle.

Defendant counters that Ms. Boyd's testimony should be given little or no weight because her appraisal failed to consider alternate uses for the property. Her testimony is to the contrary, however. She explained, as did Dr. Squires and Mr. Smith, that the land itself had two potential uses: brine disposal or cattle grazing. All use for brine disposal ended with the cease and desist order. We accept the explanation of plaintiff's witnesses that the use of the land for grazing was purely theoretical, given the size and isolation of this very barren parcel, and its lack of water. Although defendant implies that there might have been alternate uses for the property, defendant offered no expert evidence.[12] We conclude that, whatever the values of the leasehold and right-of-way were prior to the cease and desist order, they had no economically beneficial use thereafter.

Plaintiff's subsequent sale of its pipeline and a few other fixtures, along with forty acres, for $300,000 does not diminish the impact of the taking on the real property interests. The fact that the only bill of sale lists fixtures and bears a sales price of $10 does not suggest, as defendant contends, that the forty acres accounted for the balance. Dr. Squires testified that the land was incidental to the sale, implying that the stated consideration was nominal. This is consistent with the testimony of Smith and Boyd. Pronghorn, moreover, according to Dr. Squires, was going to attempt to obtain permits for deep well injection. No evidence was offered as to whether the land figured in those plans, or whether Pronghorn was ever successful in obtaining those permits. Defendant never contended that plaintiff could have converted its operation to deep well injection, which, in any case, would not avoid the complete taking of the right-of-way.

Finally, we reject defendant's contention that the court should take into account the fact that the principal behind Laguna Gatuna—its organizer and principal shareholder—was Dr. Squires. Dr. Squires, it argues, had other assets, principally the rest of Snyder Ranch, which should be included in the "after" value. We disagree. Laguna Gatuna was a legally organized entity with a separate existence. Notions of "piercing the corporate veil" are irrelevant here.

### 3. Character of the Governmental Action

Defendant conceded that "the character of the governmental action" is consistent with a taking. We agree. This factor brings to bear, among other considerations, whether the government action constitutes, or mimics, physical restrictions on the use of real property. Plainly the cease and desist order had that effect.

### CONCLUSION

The Supreme Court has held that land use regulation will constitute a taking if it "denies an owner economically viable use of his land." *Agins v. Tiburon,* 447 U.S. 255, 260,

---

**12.** By order of the court on October 5, 2000, plaintiff was to submit its list of expert witnesses, along with any expert reports, to defendant by October 31, 2000. Defendant was to furnish the names of any expert witnesses by November 17, 2000, and all expert reports by December 1, 2000. Defendant furnished the name of an expert to counter Ms. Boyd's testimony on January 29, 2001. Trial was scheduled to begin on February 20, 2001. Defendant offered no reason for the late designation and the court disallowed the witness.

100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). As the Court explained in *Penn Central*, the focus is "on the uses the regulations permit." *Id.* at 131. Here, the plaintiff's leasehold and right-of-way were rendered economically without value by the cease and desist order. Laguna Gatuna's legitimate, investment-backed expectations were thwarted. No economically viable uses remained. *See Lucas*, 505 U.S. at 1027, 112 S.Ct. 2886. We hold, therefore, that the leasehold and the right of way were "taken" within the meaning of Fifth Amendment and that the government must compensate Laguna Gatuna for them. The parties are directed to meet and consider further proceedings to calculate damages. Defendant is directed to file a report on behalf of both parties, on or before October 12, 2001 presenting the parties views on how to proceed.