James SARTORI, David Sartori, Willow-
brook Coal Company, and Willow-
brook Farms, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–553L.

United States Court of Federal Claims.

Aug. 18, 2005.

Kenneth G. Oertel, Tallahassee, FL, for plaintiffs.

William J. Shapiro, Washington, DC, with whom was Assistant Attorney General Thomas L. Sansonetti, for defendant.

## OPINION

CHRISTINE ODELL COOK MILLER, Judge.

This case is before the court on defendant's motion for summary judgment[1] and plaintiffs' cross-motion for partial summary judgment. Plaintiffs come to court after having obtained an appellate judicial ruling that their property never constituted jurisdictional wetlands for the nine-year period that most of it was subject to a Cease and Desist Order, which is not surprising in that the Government's own reclamation project drained the lands in question prior to plaintiffs' purchase. Plaintiffs assert that they merit partial summary judgment having established a temporary categorical taking or a regulatory taking, withholding for future proceedings a determination of damages. Defendant challenges plaintiffs' attempt to establish a compensable taking pursuant to the Fifth Amendment.

Following argument on June 15, 2004, the court suspended proceedings on June 29, 2004, at the parties' request, to allow them an opportunity to explore settlement. On February 9, 2005, with progress toward settlement not apparent, the court held a status conference. An order entered on February 10, 2005, gave plaintiffs leave to file a supplemental memorandum to address a new challenge concerning ripeness that arose during argument. The February 10, 2005 order also scheduled trial to commence on October 3, 2005. However, as the parties still were committed to pursuing settlement, the court assigned the case to a volunteer settlement judge by order entered on February 10, 2005. That judge entered an order on June 29, 2005, that "efforts at a mediated settlement ... have proven unsuccessful." By order entered on June 30, 2005, the court reinstated the trial schedule and called for defendant's supplemental reply brief, which

---

1. This is defendant's second motion for summary judgment. In 2003 the court dismissed plaintiffs' claims based on breach of contract, deprivation of substantive due process, and equitable estoppel. See Sartori v. United States, 58 Fed.Cl. 358 (2003) (order granting motion for summary judgment).

was filed on July 12, 2005. A second argument was held on August 8, 2005, to address the issue of ripeness.

## FACTS

James Sartori, David Sartori, and Willowbrook Coal Company, doing business as Willowbrook Farms ("plaintiffs"), in 1989 purchased real property located in Highlands County in Florida. Plaintiffs portray the purchase of the land in question as a "collection of several separate and distinct sections of land, including sections 11, 12 and 7, which total approximately 8,300 acres." Pls.' Proposed Findings of Fact, filed Mar. 9, 2004, ¶ 14 ("PPFF"). "Sections 11, 12 and 7 are separated from each other and from the rest of the farm by canals and drainage ditches." PPFF ¶ 45. Plaintiffs state, "Section[s] 11, 12 and 7 are a portion of what Plaintiffs own, but these sections are free standing parcels separated by ditches and canals and are so described in the legal description . . . ." Pls.' Resp. to Def.'s Proposed Findings of Fact, filed Mar. 9, 2004, ¶ 2.

The deed describes the real property purchased by plaintiffs in nine different paragraphs containing distinct property descriptions and one paragraph describing a right-of-way for a private road on the property: "Sections 11, 12, 13 and 14, Township 37 South, Range 30 East, less road right-of-way, Highlands County, Florida" and "Sections 7, 16, 17 and 18, Township 37 South, Range 31 East, Highlands County, Florida." Pls.' Br. filed Mar. 9, 2004, Ex. A.

In 1992 plaintiffs began to clear the vegetation from sections 7, 11, and 12. The next year the Department of the Army, Jacksonville District Corps of Engineers (the "Corps"), sent a Cease and Desist Order dated November 1, 1993 (the "Corps Cease and Desist Order"), to plaintiff James Sartori. The Cease and Desist Order indicated that an inspection had revealed that Mr. Sartori "graded and/or cleared approximately 1500 acres of jurisdictional wetlands in Sections 7, 11 & 12, Township 37 South, Range 38 East, Highlands County, Florida." Invoking the Clean Water Act, 33 U.S.C. §§ 1251–1387 (2000) (the "CWA"), the Corps instructed Mr. Sartori to cease and desist from further grading or clearing. On December 22, 1994, the United States Environmental Protection Agency (the "EPA") issued Administrative Order No. 404–95–07 (the "EPA Cease and Desist Order"),[2] which found Mr. Sartori "in violation of Section 301(a) of the (CWA) by causing the discharge of pollutants into waters of the United States without a permit" and ordered him to desist. The term "Cease and Desist Order," as used herein, refers to both orders because the Corps Order triggers the date of the alleged temporary taking, which was continued without interruption by the EPA.

The parties agree that plaintiffs' land-clearing activities ceased at least by late 1993. Prior to that time, plaintiffs had planned to clear and level the property, rendering it suitable for agricultural production.[3]

---

**2.** For ease of reference, the Administrative Order will be referred to as the "EPA Cease and Desist Order" because it operated in the same manner as an EPA Cease and Desist Order.

**3.** Defendant claims to be unable to dispute or admit this proposed finding of fact as no discovery has been conducted on the issue. Defendant's request for an opportunity to conduct discovery should the court find plaintiff's claim to be ripe and the showing of extraordinary delay satisfied, Def.'s Br. filed Apr. 6, 2004, at 15 n. 10, comes too late.

The instant case was stayed originally on September 30, 1998, pending proceedings in the Southern District of Florida. *See* Order entered Sept. 30, 1998. The stay was continued pending appeal and subsequently lifted on April 17, 2003, upon affirmance of the district court's decision by the Eleventh Circuit. *See United States v. Sartori*, 62 Fed.Appx. 919 (11th Cir.2003) (Table),

*aff'g mem. United States v. Sartori*, No. 98–14087, slip op. at 7 (S.D.Fla. Nov.13, 2001) (unpubl.). In a status report filed November 21, 2003, defendant indicated that the parties conducted voluminous discovery during the district court proceedings and the parties stipulated to the use of that discovery in the instant case. "Defendant does not believe additional discovery is necessary for the purposes of Defendant's Motion for Summary Judgment." Jt. Status Report, filed Nov. 21, 2003, at 3.

*Brubaker Amusement Co. v. United States*, 304 F.3d 1349 (Fed.Cir.2002), instructs that a party may not avoid summary judgment by simply asserting that discovery is necessary when it has failed to file an affidavit explaining why discovery would be needed to respond to a summary judgment motion per RCFC 56(g). Defendant has not filed a motion for discovery since filing its motion for summary judgment.

After a meeting between the parties, plaintiffs, in May 1994, retained Kevin L. Erwin, a private consultant, to perform, at their expense, a wetlands delineation on the land at issue. The EPA approved Mr. Erwin's methodology for determining whether the site was a wetland, provided that well levels were read once weekly. Upon reading the levels of 80 wells he had installed throughout the site, Mr. Erwin "concluded that the Site in Question, Sections 11 and 12 of [plaintiffs'] property, was not a jurisdictional wetland based on the lack of wetland hydrology on the Site." *United States v. Sartori,* No. 98–14087, slip op. at 7 (S.D.Fla. Nov.13, 2001) (unpubl.), *aff'd mem.,* 62 Fed.Appx. 919 (11th Cir.2003) (Table). Defendant submits the affidavit of Robert J. Lord, an EPA employee who processes wetlands enforcement cases pursuant to the CWA, to indicate that the EPA ultimately disagreed with the methodology utilized by Mr. Erwin because he did not use "Section F," which outlines the procedures for atypical or disturbed sites. Declaration of Robert Lord, Apr. 1, 2004, ¶¶ 6–10.

During June 1998, the Government's expert, Wade Nutter, also performed a study of the land, concluding that Sections 11 and 12 did not exhibit wetland hydrology at that time, but that wetland hydrology existed on the site before plaintiffs' activities on the land. *Sartori,* No. 98–14087, slip op. at 7–8. The district court's findings of fact clarify that plaintiffs' property is a "former wetland that has been drained by human activities-i.e. the Watershed Project." *Id.* at 10, ¶ 42. The Watershed Project operated in the 1960s by installing drainage and irrigation systems to facilitate agricultural use of land exhibiting wetland hydrology. The district court found that this project, and not plaintiffs' land-clearing activities, drained the property of its wetland status. Significantly, both Mr. Nutter's methodology and conclusions were rejected.

Plaintiffs contend that the EPA's Cease and Desist Order eliminated for up to nine years all economically viable use of Sections 7, 11, and 12, which are some of the most productive farmlands in Florida. Sections 11 and 12 remained fallow between November 1, 1993, and May 15, 2003, when the EPA lifted its Cease and Desist Order. Agricultural production began on Section 7 on March 1, 1999.

Plaintiff James Sartori avers:

> The only value the land in Sections 11, 12, and 7 possesses is for agricultural use. As long as the Cease & Desist Order was in effect there was no possibility of using this land in any economically useful manner. In fact, while the Cease & Desist Order was in effect, Sections 11, 12 and 7 were left without any value at all. The land was rendered worthless as the sole result of this Order.

Affidavit of James Sartori, Feb. 24, 2004, ¶ 7. Plaintiffs claim a cash loss of $1 million from the loss of the use of Section 7 and $5.5 million from Sections 11 and 12. Sartori Aff. ¶ 9. Plaintiffs also claim a loss of $7,742,400 (plus interest, attorneys fees, and costs) from the evaporation of peat soil from the property during the time period of the Cease and Desist Order. Amended Compl. filed Aug. 1, 2005, ¶ 18.

## DISCUSSION

### 1. *Summary judgment*

The Court of Federal Claims is empowered by the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States[.]" Because plaintiffs allege a temporary taking of property without compensation, a violation of the Fifth Amendment, they assert a claim under the Tucker Act.

"Whether or not a taking has occurred is a question of law based on factual underpinnings." *Wyatt v. United States,* 271 F.3d 1090, 1096 (Fed.Cir.2001). While a court should avoid "precipitous grants of summary judgment" in takings cases owing to the "fact-intensive" nature of such claims, *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983), that this is a "takings case does not affect the availability of summary judgment when appropriate to the

circumstances." *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996).

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.2001). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 2. *Regulatory takings*

■ The Fifth Amendment provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In addition to taking property by physical occupation or invasion, a taking may occur where the Government regulates private property. *Penn. Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Although the Government certainly may regulate property without giving rise to a compensable taking, "if regulation goes 'too far' it will constitute a compensable taking." *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153 (Fed.Cir. 1995) (quoting *Penn. Coal,* 260 U.S. at 415, 43 S.Ct. 158). Limits are placed on the Government's regulation of private property flowing from the recognition that, if "subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].' " *Lucas,* 505 U.S. at 1014, 112 S.Ct. 2886 (alterations in original) (citation omitted).

Assuming that a claim is ripe, the court must determine if the regulation goes "too far." To do this, the court must make a "'two-tiered' inquiry into the government act alleged to have constituted a taking." *Chancellor Manor v. United States,* 331 F.3d 891, 901 (Fed.Cir.2003).

First, the court must consider "the nature of the interest allegedly taken to determine whether a compensable property interest exists." *Chancellor,* 331 F.3d at 901; *M & J Coal,* 47 F.3d at 1154 (analyzing whether "interest was a 'stick in the bundle of property rights' acquired by the owner"). If plaintiffs are unable to prove that they held a protected property interest, their takings claim will fail. *Wyatt,* 271 F.3d at 1096 (holding that "only persons with a valid property interest at the time of the taking are entitled to compensation"). If plaintiffs succeed in meeting the first element, the court then must determine whether the Government's action "constitutes a compensable taking of that interest for a public purpose." *Chancellor,* 331 F.3d at 902; *see also M & J Coal,* 47 F.3d at 1154.

Defendant has withdrawn its argument that plaintiffs lack a property interest under the Fifth Amendment, thus waiving the first step of the *Chancellor* inquiry. Def.'s Br. filed Apr. 6, 2004, at 1 n. 1. The court therefore will proceed directly to the determination of whether a compensable temporary taking occurred.

Plaintiffs advance two theories by which they contend a compensable taking occurred. First, plaintiffs assert a claim for a temporary categorical regulatory taking under *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1017, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (holding that categorical taking requires that regulatory imposition remove all economic value from property). Second, in the alternative, plaintiffs claim for a temporary regulatory taking under *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 130–31, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (holding that regulatory taking requires analysis of parcel as a whole and establishing three factors for such determination, including economic impact of regulation on claimant, regulation's interference with investment-backed expectations, and character of governmental action). Both of the claims are discussed in more detail herein.

3. *Ripeness*

The court first must consider whether plaintiffs' takings claims have ripened. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 807–808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (quoting *Abbott Lab. v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Ripeness limitations are "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 58, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993).

When a court holds a claim to be unripe, it essentially is refusing to exercise jurisdiction over the case. The burden of establishing the court's jurisdiction rests with the party seeking to invoke it, *see Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed.Cir.2002), as federal courts are presumed to lack jurisdiction unless the record affirmatively indicates to the contrary. *See Renne v. Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). When a federal court hears such a jurisdictional challenge, "its task is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* The court may consider all relevant evidence, including evidentiary matters outside the pleadings, when resolving a jurisdictional challenge. *See Alexander v. United States*, 52 Fed.Cl. 710, 712 (2002) (citing *Indium Corp. of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 884 (Fed.Cir.1985)).

■ The touchstone of the ripeness doctrine in regulatory takings is finality of agency decisions. The Supreme Court has held, "A takings claim challenging the application of land-use regulations is not ripe unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *Palazzolo v. Rhode Island*, 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). Usually, if a landowner has the option to submit a permit, he is required to do so in order to ripen his takings claim, because implicit in the permit system is the possibility that the Government will grant the landowner permission to do with the property as he wishes. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). "The mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." *Riverside Bayview Homes*, 474 U.S. at 126–27, 106 S.Ct. 455. A permit requirement therefore "does not in and of itself constitute a compensable taking." *Bass Enter. Prod. Co. v. United States*, 381 F.3d 1360, 1366 (Fed.Cir. 2004) (citing *Riverside*, 474 U.S. at 126–27, 106 S.Ct. 455); *accord Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1350 (Fed. Cir.2002) (holding that more than "mere imposition of a permitting requirement" is necessary to establish valid takings claim).

■ As the Supreme Court has cautioned, it is "important to bear in mind the purpose the final decision requirement serves." *Palazzolo*, 533 U.S. at 622, 121 S.Ct. 2448. "Ripeness doctrine does not require a landowner to submit applications for their own sake," but instead as an aid to the courts in deciding whether a regulation has gone "too far" and become a compensable taking. *Id.* The Court has held, "While a landowner must give a land use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development ... a takings claim is likely to have ripened." *Id.* at 620, 121 S.Ct. 2448.

The facts of several cases are useful in analyzing this doctrine. The Federal Circuit in *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed.Cir.1993), held that the Corps's in-

terference with plaintiff's property through the issuance of a Cease and Desist Order was not a taking. In that case the Corps issued a Cease and Desist Order preventing plaintiff from filling its wetlands without a permit. *Id.* at 798. Plaintiff filed a permit, but then withdrew the application before the Corps could make a final decision. *Id.* Plaintiff then filed a declaratory judgment action against the Government in federal district court, asking for the Corps's jurisdiction over the property to be declared improper. *Tabb Lakes, Ltd. v. United States,* 715 F.Supp. 726 (E.D.Va.1988). The court held that the Corps's assertion of jurisdiction was "procedurally defective," because it did not comply with the Administrative Procedures Act, 5 U.S.C. § 553 (2000). *Tabb Lakes,* 715 F.Supp. at 728–29. Plaintiff then filed a temporary regulatory takings claim against the government for the time the property was subject to the Cease and Desist Order. *Tabb Lakes,* 10 F.3d at 798. The Federal Circuit declared that no such taking had occurred. *Id.* at 801–02. The court reasoned that the Cease and Desist Order did not go "too far" because it "specifically left the door open to development by obtaining a permit," and therefore was not a final decision. *Id.* at 801. Furthermore, while plaintiff applied for a permit, it withdrew the application before the agency had a chance to make a final decision regarding it. *Id.* The court declared, "[G]overnmental interference as part of preliminary decisionmaking does not amount to a taking." *Id.* Because there was no final decision by the Corps regarding the land-only "preliminary decisionmaking"-plaintiff's takings claims were not ripe.

Next, the plaintiff in *Boise Cascade,* 296 F.3d at 1342–43, alleged several different types of takings based on an injunction issued by a federal district court in Oregon that prevented plaintiff from logging in an area inhabited by spotted owls. The Federal Circuit held this situation to be indistinguishable from that in *Tabb Lakes. See id.* at 1348. Plaintiff in *Boise Cascade* applied for a permit to log its land despite the injunction. The agency, instead of granting or denying the permit, lifted the permit requirement and withdrew the injunction against the plaintiff. Plaintiff sued for a temporary reg-

ulatory taking for the time period during which he was enjoined from logging his property. The Federal Circuit, citing *Riverside Bayview* and *Tabb Lakes,* held that no regulatory taking had occurred "because the Service never denied Boise's permit." *Id.* at 1347. In fact, the agency, in effect, had granted the permit request by lifting the injunction. *Id.* at 1351 n. 9. Because the permit was not denied, "only an extraordinary delay in the permitting process [could] give rise to a compensable taking," and in this case there was no such delay. *Id.* at 1349. The court did suggest that, in a situation where the agency denies a permit application and thereafter withdraws its jurisdiction or reconsiders the application, a plaintiff's takings claim might be ripe. *Id.* at 1347.

In *Laguna Gatuna, Inc. v. United States,* 50 Fed.Cl. 336 (2001), plaintiff owned interests in a dry lake bed, which it intended to use for oil field brine disposal. For that purpose special permits and thereafter a right-of-way were obtained, as was a letter from the EPA stating that the "lake" would not be considered "waters of the United States" that are subject to CWA control. *Id.* at 338–39. The EPA, however, found dead birds near that land area and issued a Cease and Desist Order in 1992. The EPA voluntarily withdrew that order after a United States Supreme Court case, *Solid Waste Agency of N. Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), held that such lakes were not subject to EPA authority. Plaintiff then filed a claim for a temporary regulatory taking for the time its property was under the Cease and Desist Order. *Laguna Gatuna,* 50 Fed.Cl. at 337. Although the court ruled that a taking had occurred, ripeness was not at issue.

Plaintiffs in the instant case point out that the landowners in *Tabb Lakes* and *Boise Cascade* had wetlands or endangered species on their property—in other words, some plausible basis to sustain the exercise of regulatory authority. *See* Transcript of Proceedings, *Sartori v. United States,* No. 98–553L, at 24–25 (Fed.Cl. July 15, 2004) ("Tr."). Plaintiffs' explanation is not satisfactory in

that the Corps ultimately had no jurisdiction over the subject property in *Tabb Lakes*.

Defendant argues that *Tabb Lakes* and *Boise Cascade* taken together, signify that a Cease and Desist Order cannot by itself give rise to a valid takings claim if a permit application is permitted. Furthermore, the Federal Circuit has held that the Corps's withdrawal of a permit requirement is tantamount to a grant of a permit. *Boise Cascade*, 296 F.3d at 1339 1351 n. 9. In defendant's view the current precedent dictates that, in order to preserve his takings claim, the landowner must apply for a permit. If the landowner fails to apply for a permit, and instead only challenges the jurisdiction of the Cease and Desist Order, the landowner will waive his takings claim. It is only after the agency makes a final decision on the permit application that the landowner's takings claim ripens.[4] Because plaintiffs did not apply for a permit in this case, the Government contends that plaintiffs' taking claims could not have ripened.

Plaintiffs read the case law differently. They argue that it is absurd to require a permit application where, as here, the Cease and Desist Order was held not to be within the jurisdiction of the agency, although the Corps had the authority to issue it as an initial matter. Plaintiffs argue that they took every conceivable action to cooperate with the Corps, commissioning a study-agreed to and supported by the Corps-that determined the property was not wetlands. Significantly, the Corps agreed to abide by the results of the study, which indicates that the parties viewed the study as a step preceding the application for a permit. Plaintiffs decry defendant's attempt to insist on a permit on this set of facts, because the circumstances belied any notion that a permit would have been necessary. As plaintiffs' counsel stated:

> It's obnoxious to say you should have applied to this agency for a permit that the Clean Water Act gives them no jurisdiction to issue and gives you no requirement to apply for. I think it's an argument that

takes language from cases with a legitimate wetlands issue and tries to apply it to a case such as this which may be fairly unique in its facts.

Tr. at 28.

The question is framed by the facts of this case. The Federal Circuit and the Supreme Court have made it abundantly clear that a landowner must meet strict requirements to ripen his takings claim. The case law requires a final agency determination of some sort-almost always the denial of a permit-in order to ripen a takings claim. However, the court is reluctant to embrace defendant's draconian reading of *Tabb Lakes* and its progeny, because it elevates form over substance: Plaintiffs disputing jurisdiction would be required to apply for permits that they neither want nor require simply to ground takings liability. While plaintiffs have the burden to establish subject matter jurisdiction, *see Myers Investigative & Sec. Servs.*, 275 F.3d at 1369, and the court has counseled plaintiffs on the risk that trial may prove that the permit should have been sought, the court cannot enter judgment against plaintiffs without full development of the record. The court has determined, in the exercise of its discretion, that a trial restricted to the ripeness inquiry would duplicate witnesses testimony and documentary evidence that would be introduced at a trial on the merits. Therefore, the previously scheduled trial shall proceed on all issues.

The following issues should be addressed. Plaintiffs "concede[d] the validity of the government action," as required by *Tabb Lakes*, 10 F.3d at 802. Plaintiffs did not challenge the authority of the Corps to assert jurisdiction over wetlands on the property, or to determine if wetlands existed on the property. In fact, plaintiffs cooperated fully with the Corps. Plaintiffs promptly entered negotiations with the Corps after receiving the Cease and Desist Order. They came to an agreement with the Corps that plaintiffs would pay for a study, using methods approved by the Corps, to determine if the land was wetlands. In particular, this case is

---

4. Although a temporary taking might occur, even without a final decision regarding a permit, in the case of extraordinary delay by the Government, *see Wyatt*, 271 F.3d at 1097, plaintiffs are not asserting extraordinary delay in the permit process.

distinguished from *Tabb Lakes* by plaintiff's cooperation with the Corps and the parties' agreement to perform this study. This study was both a concession of the validity of the Corps's jurisdiction over any wetlands on the property and an attempt to resolve the disputed issue-whether such wetlands existed. The district court found that plaintiffs sought from the Corps a binding determination about whether the property was a wetland, and the Corps agreed. *Sartori*, No. 98–14087, slip op. at 6.

Plaintiffs are also entitled to show whether the negotiations with the Corps, and the mutually agreed-upon study, operated as the equivalent of a permit for the purposes of determining whether a final agency decision had been rendered. The cases are consistent in their proclamation that a permit requirement, without more, does not in itself constitute a taking of property. *See Riverside*, 474 U.S. at 126–27, 106 S.Ct. 455; *Tabb Lakes*, 10 F.3d at 801–802; *Boise Cascade*, 296 F.3d at 1350. The purpose of the ripeness doctrine is to ensure the agency has issued a sufficiently final decision to inform a determination of whether the regulation at issue has gone "too far." With the normal permit requirement case, it is impossible to know if the regulation has gone "too far," because nothing resembling a final agency decision can be reviewed until the agency has denied a permit application.

The study and its results may qualify as a an "opportunity [for the land-use authority] to exercise its discretion." *See Palazzolo*, 533 U.S. at 620, 121 S.Ct. 2448. Furthermore, the agency's determination that plaintiffs' property was wetlands, in face of the cooperative study, might be sufficient to act as a final agency action regarding the existence of wetlands and ripen plaintiffs' takings claim. *See id.* ("While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened.") Indeed, plaintiffs contend that had the study determined the presence of wetlands, plaintiffs would have applied for a permit. If plaintiffs and the Corps understood the study to crystalize the agency's position on the regulation of the land, applying for a permit (in addition to the study) would have been pure fantasy-a "[permit] application for [its] own sake" rather than to determine how far the regulation actually went in taking the property. *Id.* at 620, 121 S.Ct. 2448 ("Ripeness doctrine does not require a landowner to submit applications for their own sake . . . ."). Neither *Boise Cascade* nor *Tabb Lakes* evidenced anything that might have qualified as a final agency determination. In this case, the study may qualify, and the plaintiffs are entitled to submit evidence on the issue.

Finally, plaintiffs argue that as a matter of fact and law, it was impossible for them to submit a permit because no wetlands exist on their property. Plaintiffs assert that, in this situation, the Corps does not accept after-the-fact permit requests. They read Department of the Army regulation, 33 C.F.R. § 326.3 (2004), to prevent them from filing a permit application until after they completed corrective measures on their property. These corrective measures, such as filling ditches, would have created wetlands on property previously drained by the Corps and, thus, were "impossible" for plaintiffs to accomplish without destroying their claim.

The relevant regulations provide, in pertinent part:

§ 326.1  Purpose.

This part prescribes enforcement policies (§ 326.2) and procedures applicable to activities performed without required Department of the Army permits (§ 326.3) and to activities not in compliance with the terms and conditions of issued Department of the Army permits (§ 326.4).

§ 326.3  Unauthorized activities.

(e) After-the-fact permit applications. (1) Following the completion of any required initial corrective measures, the district engineer will accept an after-the-fact permit application unless he determines that one of the exceptions listed in subparagraphs i-iv below is applicable. . . . Situations where no permit application will be processed or where the acceptance of a

permit application must be deferred are as follows:

. . . .

(ii) No permit application will be accepted in connection with a violation where the district engineer determines that legal action is appropriate (§ 326.5(a)) until such legal action has been completed.

§ 326.5 Legal action.

(a) General. For cases the district engineer determines to be appropriate, he will recommend criminal or civil actions to obtain penalties for violations, compliance with the orders and directives he has issued pursuant to §§ 326.3 and 326.4, or other relief as appropriate.

33 C.F.R. §§ 326.1, 326.3, 326.5 (2004).

The record is not sufficiently developed to make findings in plaintiffs' favor. First, no evidence has been established that the Corps does not accept permit applications in this situation.[5] Next, the cited regulations are inapplicable to the facts. The court agrees with plaintiffs' interpretation of section 326.3 to require "the completion of any required initial corrective measures" before an after-the-fact permit application can be granted. However, the record does not show any required corrective measures by the Corps. The November 1, 1993 Corps Cease and Desist Order does not mention any required corrective measures. It says that, if plaintiffs "choose," they may "voluntarily restore the area" and thus "absolve [themselves] from further legal action." The Corps's corrective measures were voluntary, not required. Therefore, plaintiffs were not "required" by the Corps to take "corrective measures" prior to submitting an application.[6]

This leaves only plaintiffs' argument that their permit application would be barred by

subsection (ii), which requires, "No permit application will be accepted in connection with a violation where the district engineer determines that legal action is appropriate (§ 326.5(a)) until such legal action has been completed." 33 C.F.R. § 326.3(e)(1)(ii) (2004). The court agrees with defendant that this section is not applicable. The Cease and Desist Order issued by the Corps was not a determination that legal action was appropriate under section 326.5(a). That designation is reserved for subsequent enforcement actions. See 33 C.F.R. § 326.5(a). Therefore, on the current record, the court rejects plaintiffs arguments that section 326.3 made submission of a permit impossible.

4. "Parcel as a whole"

■ Because the issue of ripeness cannot be resolved on dispositive motions, it becomes necessary to examine the cross-motions for summary judgement on plaintiffs' claims for a temporary categorical regulatory taking under *Lucas* and a temporary regulatory taking under *Penn Central.* In both cases the analysis rests first on the court's determination of the "parcel as a whole":

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole.

*Penn Cent.,* 438 U.S. at 130–31, 98 S.Ct. 2646. This is the predicate for both regulatory taking cases under the general rubric of *Penn Central* and also for the specific subset of categorical taking cases. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning*

5. During oral argument, plaintiffs offered affidavits of experts to support this assertion, which the court did not accept. This is evidence for trial.

6. On the other hand, the EPA Cease and Desist Order did contain required corrective measures, such as filling ditches and allowing the area to revegetate. The court assumes that these are the corrective measures to which plaintiffs refer. However, these measures were issued by the

EPA, not the Corps. The regulations that plaintiffs cite do not refer to the EPA. See 33 C.F.R. 326.1 (2004) ("This part prescribes enforcement policies (§ 326.2) and procedures applicable to activities performed without required Department of the Army permits (§ 326.3) . . . ."). Thus, section 326.3 did not require plaintiffs to perform EPA corrective measures before applying for a Corps permit.

*Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). In *Tahoe* the Court rejected petitioners' argument that a categorical taking under *Lucas* could be found by isolating the 32–month period in which development moratoria was in effect. "The starting point for the court's analysis should have been to ask whether there was a total taking of the entire parcel; if not, then *Penn Central* was the proper framework." *Id.* at 331, 122 S.Ct. 1465; *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 643–44, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("Claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question."); *Rose Acre Farms, Inc. v. United States,* 373 F.3d 1177, 1190 (Fed.Cir.2004) (holding that where regulation took only portion of appellee's eggs in three farms, "parcel as a whole" must include affected and unaffected eggs and henhouses on all three farms); *Tabb Lakes,* 10 F.3d at 802 ("Clearly, the quantum of land to be considered is not each *individual* lot containing wetlands or even the combined area of wetlands. If that were true, the Corps' protection of wetlands via a permit system would, *ipso facto,* constitute a taking in every case where it exercises its statutory authority.").[7]

Thus, the first inquiry is to define the "parcel as a whole." Plaintiffs propose to define the parcel "by the character and function of the government's regulation," to wit, sections 7, 11, and 12, which were the subject of the Cease and Desist Order. Pls.' Br. filed Mar. 9, 2004, at 17. Defendant opposes allowing the parcel to be "sever[ed] conceptually," Def.'s Br. filed Apr. 6, 2004, at 9, insisting that the parcel as a whole properly includes plaintiffs' entire 8,300–acre parcel.

Plaintiffs' argument that perimeters of the government regulation may define the relevant portion of the property does not succeed. For this proposition plaintiffs rely on both *Fla. Rock Indus., Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), and *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 391–93 (1988), *aff'd,* 28 F.3d 1171 (Fed.Cir. 1994). Any broad rule that may be drawn from these cases simply does not survive more recent Supreme Court precedent that indicates that "defining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, every delay would become a total ban; the moratorium and the normal permit process alike would constitute categorical takings." *Tahoe–Sierra,* 535 U.S. at 331, 122 S.Ct. 1465.

In *Florida Rock* only 98 of the 1,560 acres originally purchased formed the "parcel as a whole." The 1,560 acres were purchased in 1972 for the sole purpose of limestone extraction. In 1980 the Corps issued a Cease and Desist Order to stop the limestone mining, which had commenced in 1978. Florida Rock then applied for a permit to discharge dredged or fill material into navigable waters for 98 acres (enough to suffice for three years' production), and the Corps refused to consider more, although Florida Rock would have preferred permission to mine the entire acreage. The Federal Circuit distinguished *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184 (1981), and *Jentgen v. United States,* 228 Ct.Cl. 527, 657 F.2d 1210 (1981), in that the Corps in those cases "considered the entire tracts and determined that portions thereof could be developed as proposed," whereas the Corps in *Florida Rock* "considered only the 98 acres." 791 F.2d at 904. The mere possibility that a permit could issue for the other acreage was disclaimed, given the Corps's announced prejudgment against any such application. Because Florida Rock likely could not have

---

7. *Concrete Pipe,* however, is distinguishable from both *Lucas* and the instant case which involves takings claims in the context of real property. *Concrete Pipe* considered taking by regulations requiring payments from a pension fund. *See Concrete Pipe & Prods. of Cal.,* 508 U.S. at 645– 46, 113 S.Ct. 2264. *Tabb Lakes* involved a regulatory takings claim based on a Cease and Desist Order issued by the Corps that ultimately was found to be without jurisdiction because of a defect in issuing the order. *Tabb Lakes,* 10 F.3d at 798–99.

mined more than those 98 acres in the three-year time frame in question, the Federal Circuit was content to define the parcel as whole within those parameters. Focusing on the three-year time frame may have rendered less speculative the nature of the alleged injury.

In *Loveladies* the Federal Circuit affirmed the approach of first narrowing the focus to the value of the wetland property held at the time that the alleged taking occurred, not the time of the initial land purchase. The Claims Court had excluded 38.5 acres, for which the State of New Jersey already had denied the necessary permit, and 6.4 sporadically held acres, which were no longer contiguous with the 12.5 acres at issue in that case. Those 12.5 acres included one acre of uplands, which the Government argued was outside the jurisdiction of the Corps. Because the upland acre was an island in the sea of wetlands, the regulation at issue effectively precluded access to this island and thereby constituted a taking of the upland. As a consequence, the 12.5 acres formed the parcel as a whole. The Federal Circuit agreed with this determination of the parcel and affirmed that in this case the owner of the relevant parcel was deprived of all economically feasible use, thereby effecting a total taking of the property owner's interest.

While plaintiffs in the case at bar may not rely on the regulation itself to define the parcel as a whole, they are not precluded from asserting that, based on the deed to the property, they purchased "three distinct parcels not described by metes and bounds, but by separate and distinct legal descriptions." Pls.' Br. filed Apr. 26, 2004, at 10. Plaintiff Sartori avers that the property is "composed of a collection of individual sections of land." Sartori Aff. ¶ 8. Each section is a free-standing parcel separated from every other section by canals and ditches. *Id.* Although plaintiffs are not to be encouraged that proving the parcel as whole consists solely of sections 7, 11, and 12 will be easy, their showings at this stage are sufficient to withstand defendant's summary judgment motion. The record should be developed as to the lay of the land, the location of those parcels in relation to the rest of the land, and the type of land

inherent to each parcel. These facts will determine whether a "unique attribute inherent in the restricted portion provides a basis for distinguishing it from the unrestricted portion." *Rose Acre,* 373 F.3d at 1190.

### 5. *Temporary categorical taking under Lucas*

■ Plaintiffs assert that the Government has exacted a temporary categorical taking under the *Lucas* rubric. *See Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886. A categorical taking is one in which a regulatory imposition removes from the property all economic value, *i.e.,* all potential economic use. *See Tahoe–Sierra,* 535 U.S. at 325, 122 S.Ct. 1465; *Maritrans Inc. v. United States,* 342 F.3d 1344, 1353–54 (Fed.Cir.2003); *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed.Cir.2000). If the diminution in value is 95%, and not 100%, a taking is not categorical. *See Tahoe–Sierra,* 535 U.S. at 330, 122 S.Ct. 1465. A categorical taking differs from a situation where the owner is left with substantial viable economic use despite a restriction on some uses of the land. Only when a taking is non-categorical does the court embark on the fact-based inquiries dictated by *Penn Central. Maritrans,* 342 F.3d at 1351.

■ *Lucas* presented the pristine situation where legislation enacted by the state prevented the landowner from pursuing any development on his two parcels of land (which he had intended for single-family residencies) and thereby rendered the parcels "valueless." 505 U.S. at 1007, 112 S.Ct. 2886. "When, however, a regulation that declares 'off-limits' all economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate, compensation must be paid to sustain it." *Id.* at 1030, 112 S.Ct. 2886. The "total taking" analysis involves the degree of harm that a plaintiff's proposed activities pose to the public land and resources, or adjacent private property, the social value of those activities, and the ease with which the alleged harm could be avoided. *Id.* at 1030–31, 112 S.Ct. 2886. The Supreme Court held in *Lucas* that the state could demonstrate that it was taking nothing only by showing background principles of nuisance and property

law which preclude any development intended by the property owner. *Id.* at 1031–32, 112 S.Ct. 2886.

The *Lucas* holding, however, is quite narrow and has been confined to facts that substantiate a permanent deprivation of all economic use on all the parcels purchased by the property owner. *"Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value[.]" *Tahoe–Sierra,* 535 U.S. at 332, 122 S.Ct. 1465. Although the Federal Circuit recently has hinted that a temporary categorical taking may be possible, *Seiber v. United States,* 364 F.3d 1356, 1368 (Fed.Cir. 2004), once again plaintiffs should beware of undue encouragement. In declining to hold that such a categorical temporary taking occurred in *Seiber,* the court stated that it refrained from ruling out the rare possibility that a temporary categorical taking could exist. *Id.*

The Federal Circuit's opinion in *Rose Acre,* 373 F.3d 1177, however, portends the unlikelihood of establishing a categorical temporary taking in the instant case. As plaintiffs note, the trial court had found a categorical taking in *Rose Acre,* 55 Fed.Cl. at 662, based on the Government's appropriation of 6,741 hens for salmonella testing procedures. This part of *Rose Acre* is easily distinguishable in that it involved an actual physical appropriation of property, whereas the issuance of a Cease and Desist Order clearly does not. Furthermore, the Federal Circuit's opinion, which issued subsequent to briefing and oral argument in this case, rejected the proposition that the "mere fact that government officials carried out the testing (and the prerequisite seizure and destruction of the hens) [was] enough to transform what could otherwise qualify for takings compensation only if the *Penn Central* standard were met into a categorical taking." *Rose Acre,* 373 F.3d at 1197.

Plaintiffs argue that the denial of "all economically viable use of their property" during the nine-and-one-half-year period in which the Cease and Desist Order was in effect squarely satisfies the requirements for a categorical taking under *Lucas.* Pls.' Br. filed Mar. 9, 2004, at 23. They also attempt to distinguish the instant case from other categorical takings cases in which a landowner develops both wetlands and uplands. While in the instant case no wetlands are present-only uplands-this fact alone does not substantiate a categorical taking. Moreover, even assuming, *arguendo,* that the parcel as a whole consists of only sections 7, 11, and 12, plaintiffs have not demonstrated how their inability to develop those parcels for a temporary period of up to nine and one-half years rises to the vaulted circumstances of a categorical taking.

6. *Temporary regulatory taking under Penn Central*

■ Plaintiffs also claim a temporary regulatory taking pursuant to *Penn Central.* Compensation may be due for temporary regulatory takings, as well as for permanent ones. *Seiber,* 364 F.3d at 1364. Such a taking can be predicated on a permanent taking being temporally cut short, with the essential factors of a finite start and end to the taking, and extraordinary delay in the governmental decision-making process. *See id.; Wyatt v. United States,* 271 F.3d 1090, 1097 n. 6 (Fed. Cir.2001) ("Temporary takings are not different in kind from permanent takings.")

In deciding whether a taking has occurred under *Penn Central,* the Supreme Court has identified three factors to be considered: "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action." *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646 (citation omitted); *Maritrans,* 342 F.3d at 1349–50 (articulating *Penn Central* factors as "character of the governmental action at issue, the economic impact of the action on the claimant, and the extent to which the action has interfered with the claimant's distinct, investment-backed expectations").

*Rose Acre* provides guidance regarding the application of the *Penn Central* factors. *Rose Acre* produced table eggs, which are raw poultry eggs sold in their shells. Three of its eight layer-hen farms were subject to certain United States Department of Agriculture (the "USDA") regulations, which re-

stricted egg sales if salmonella bacteria were found on the farms. In 1990, at the time these interim regulations were promulgated, the USDA held the view that evidence of salmonella in the hens' environment signified that the hens were infected and would likely produce salmonella-containing eggs. The interim regulations prohibited the interstate shipment of eggs if environmental test samples of its origin flock test positive for salmonella. The final regulations paralleled the interim regulations, but imposed restrictions on individual layer-houses rather than whole flocks.

After salmonella outbreaks were traced back to three of Rose Acre's farms, USDA officials imposed the interstate shipment restrictions and also physically removed and destroyed 60 hens whose blood had tested positive for salmonella. In order to remove the restrictions, Rose Acre had to depopulate, clean, and disinfect the hen houses, which, in some cases, were empty for long periods pending USDA inspection. Rose Acre was released from the restrictions in 1992, with the consequence that for a 25–month period, Rose Acre could not sell eggs as table eggs from one (or more) of the three farms in question.

The Federal Circuit emphasized that the "parcel as a whole" concept applies in regulatory takings and is relevant to the economic impact factor as discussed in Rose Acre. *Rose Acre*, 373 F.3d at 1185. The appropriate "denominator" for purposes of the economic impact analysis was deemed to be the three farms with hen houses affected by the regulations. Although neither party had asserted that the relevant parcel consisted of all eight Rose Acre farms, the Federal Circuit rejected Rose Acre's attempt to focus the analysis on only the affected hen houses. The trial court had noted only that 57.5 million dozen eggs were diverted for sale at less than the cost of production, rather than examining the reduction of value of each egg in the context of the relatively brief period in which the regulations affected Rose Acre (two years after which, Rose Acre reverted to pre-restriction levels). The trial court was directed on remand to "determine whether the economic impact in this case is best measured by the value decline (a 10.6% diminution) or profitability decrease (at most, a reduction from a 4.8% profit to a 6.3% loss) caused by the restrictions." *Id.* at 1190.

As for the second *Penn Central* factor-reasonable investment-backed expectations-the Federal Circuit supported the trial court's conclusion that this factor favored Rose Acre. Although the poultry industry has always been highly regulated, the salmonella regulations were "grounded in new scientific understanding . . . and were unprecedented in their reliance on environmental and hen testing." *Id.* at 1191.

The Federal Circuit disputed both the factual underpinnings and legal reasoning in the lower court's analysis of the third *Penn Central* factor, the character of the Government's action. Specifically, the trial court had found that the salmonella regulations were misguided because they relied on ineffective testing methods that went too far in attempting to protect the public interest by prohibiting the sale of Rose Acre's healthy table eggs. These methods included restricting the sale of healthy eggs and ordering invasive hen house cleaning procedures without seeking to have the individual eggs tested, without retesting the environment or the hens other than walking through the cleaned hen houses with a flashlight, and without acknowledging that salmonella is ubiquitous in the environment and that even infected hens shed the bacteria only intermittently. Evaluating the trial transcripts, the Federal Circuit concluded that the character of the governmental action favored defendant. The "regulatory means were [not] inconsistent with knowledge the government possessed at the time they were adopted or applied against Rose Acre[,]" and because a nexus existed between those means and the purpose of protecting the public against a food-borne illness, even though the technology for testing inside individual eggs existed prior to the interim regulations. *Rose Acre*, 373 F.3d at 1195. The Federal Circuit held that egg testing was not feasible at the time the regulations were imposed on Rose Acre, notwithstanding that new technology did not account for the USDA's initiation of individual egg testing in 1991. *Id.* at 1194.

Plaintiffs focus their counter-arguments on the non-precedential Court of Federal Claims decision, *Laguna Gatuna,* 50 Fed.Cl. 336 (2001), to demonstrate how a regulatory taking may be found under the *Penn Central* analysis. In performing a *Penn Central* analysis, the court in *Laguna Gatuna* found that because plaintiff held all necessary permits, with one exception, and in part because the EPA withdrew its Cease and Desist Order, plaintiff had reasonably made substantial investments into its operation; that plaintiff's testimony that no value remained in a right-of-way once valued at $2.75 million rose to the level of economic impact suggestive of a taking; and that the Cease and Desist Order mimicked physical restriction on the use of real property. On this basis the court found a taking of the leasehold and the right-of-way.

Plaintiffs' ability to establish a temporary taking in this case pursuant to the *Penn Central* factors ultimately will depend on the definition of the parcel as whole. In plaintiffs' favor, they purchased the land with the sole intention of agricultural production-the only economically viable use for the land. The Cease and Desist Order effectively eliminated this possibility for plaintiffs during the extended period in which it was in effect. *See* Sartori Decl. ¶ 7.

The degree of economic impact may also support a taking. Plaintiffs contend that they have forfeited in lost rents (for agricultural production) an amount almost equivalent to the entire purchase price of the land. They contend that the land was left with no viable commercial or recreational uses during the five-year-four-month period that the Cease and Desist Order was in effect for Section 7, and during the nine-year-six-month period that the Cease and Desist Order was in effect for Sections 11 and 12. Recent Federal Circuit case law, however, demonstrates the in-depth nature of the requisite analysis of the economic impact and suggests that a temporary period with a relatively small diminution in value or profitability decrease may not be sufficient for effecting a taking. *See Rose Acre,* 373 F.3d at 1190.

The governmental action also mimics physical restrictions on the use of real property. By wrongfully issuing a Cease and Desist Order pertaining to property that did not contain wetlands, the Government acted within the law insofar as it has a mission to protect wetlands. Nevertheless, because plaintiffs may not be able to demonstrate that the regulatory means were inconsistent with the Corps's beliefs at the time of issuance of the order (though such beliefs were later proved to be incorrect), even this error may not favor plaintiffs' case. *See Id.* at 1195.

The court concludes there are sufficient issues of material fact for the case to go to trial on the issue of the alleged temporary regulatory taking under the *Penn Central* factors.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for summary judgment is granted insofar as judgment will enter against plaintiffs on their claim for a temporary categorical taking and otherwise is denied. Plaintiffs' motion for partial summary judgment is denied.

2. The scheduling order entered on February 10, 2005, remains in effect.